No. 48,345

Amoco Chemicals Corporation, *Appellee,* v. Thomas L. Bach, *Appellant.*

(567 P.2d 1337)

Opinion filed July 11, 1977.

*H. Randolph Williams,* of Topeka, argued the cause and was on the brief for the appellant.

590

The opinion of the court was delivered by

FROMME, J.: This is an appeal from a personal judgment against Thomas L. Bach and in favor of Amoco Chemicals Corporation. The judgment was based on delivery and sale of merchandise to Western Supply Company, Inc. Amoco filed its petition alleging (1) that Bach was personally indebted to Amoco in the sum of $4,495.01, (2) that demand for payment had been made, and (3) that Bach refused to pay the amount due. Bach filed a general denial. A bench trial resulted in a judgment in favor of Amoco and against Bach personally for $863.04 plus costs.

Evidence introduced at trial established that Bach was the president, managing officer and principal stockholder of Western Supply. Western Supply was a farm supply corporation which received the merchandise and placed it in its inventory of goods for resale. Western Supply was not made a party to the action.

We have considerable difficulty in understanding the legal theory or basis for plaintiff's judgment against Bach. The pleadings are drawn as a straight suit on an indebtedness due from Bach, an individual. The pretrial memorandum signed by the judge before trial recites:

"2. The issues are discussed as referred to in the letter of September 23rd overruling the motion for summary judgment of each of the parties. It would appear that the plaintiffs have the burden of proving a misuse of the corporation funds by the defendant Thomas L. Bach, who was at the time president and apparently the sole or principal stockholder.

"3. Plaintiffs desire to depose the defendant as to his handling of the funds. After discovery has been completed, the plaintiffs will be required to specify the factual basis for their claim that the defendant is liable for the debt of the corporation as to each of the plaintiffs.

"4. The issues to be tried include:

"1) Can Plaintiffs claim against Bach for the debts of the corporation and pierce the corporate veil?

"2) What is the effect on these claims of the letter dated November 15, 1973, and is defendant individually responsible?"

The letter of September 23, referred to in the pretrial memorandum, is not included in the record and the factual basis for the claim, which plaintiff was to specify at a later time, can only be gleaned from the evidence in the record and the arguments of defendant-appellant. The plaintiff Amoco did not appear on appeal so we do not have the benefit of a brief in support of the trial court's judgment.

The memorandum opinion of the court, omitting the final paragraph, reads:

"It appears from the file and records in this case that, but for the November 15, 1973, letter which defendant caused to be mailed to claimant, plaintiff would have pursued its legal remedies to collect $4,495.01 owed by Western Supply, Inc.

"Although the letter was on the 'Western Supply' letterhead and was unsigned, it was prepared by defendant as sole owner, president and managing agent. It was obviously intended to persuade creditors that the filing of claims under the bulk sales procedure, Case No. 26-556 in this court, was unnecessary for the reason that 'provisions have been made for this by our corporate officers.'

"Whatever was defendant's purpose in mailing the November 15, 1973, letter, it was designed to promote action which was detrimental to claimant at a time defendant either knew or in the exercise of reasonable diligence should have known corporate assets were or would likely be insufficient to pay all debts."

In the final paragraph of the memorandum opinion, which we have omitted above, the plaintiff, Amoco, was directed to prepare a journal entry granting judgment against Bach for an indefinite sum, "approximately 20% of $4,495.01." A supplemental memorandum was prepared by the court later and mailed to counsel. It reads:

"The reason I was indefinite about the exact percentage is that it may be proper that the Amoco debt [claim] of $4,495.01 be added to the claims of $56,969.91 filed in the bulk sales case, or a total of $60,555.92, and the percentage of claims to be paid adjusted downward accordingly by dividing that total figure into $11,620.78, the amount which was available for distribution.

"I am advised the computation amounts to 19.2% of the debt claimed or $863.04 for which the Clerk has been instructed to enter judgment forthwith along with the costs in the amount of $53.30, which included one-half of the Tom Bach deposition costs paid by Amoco. Accordingly, no journal entry needs to be prepared."

In order to understand the references made in the memoranda to "the November 15, 1973, letter" and to the claim "filed in the bulk sales case" a further explanation is necessary.

Western Supply was incorporated in June, 1971. Bach apparently loaned the corporation $85,000.00 to get it started in the retail business of selling farm supplies. Bach's only withdrawal from the business during its operation was an annual salary of $2,900.00. After three years of operation the accountants for the business indicated in the financial statement that the corporation had amassed an inventory of merchandise valued at $143,000.00. In that period of time its losses from operations were about $40,000.00. Arrangements were made to sell all of the fixtures and merchandise inventory, except plumbing and electrical supplies,

to the Tractor Supply Company. A contract was executed in November, 1973, providing for a sale under the Uniform Commercial Code (U.C.C.), K.S.A. 84-6-101, *et seq.,* covering bulk transfers. The contract evidenced a sale and set out a formula for fixing a final sale price for the merchandise purchased. The fixtures were valued at $24,000.00 and the merchandise inventory included in the sale was limited under the formula to not more than $84,000.00. The formula for valuation was to determine the final price to be paid by Tractor Supply. The plumbing and electrical supplies, not included in the bulk sale, were estimated by Bach to be worth $15,000.00 based on the accountant's financial statement. In advance of the sale Bach believed the debts of the corporation, excluding the $85,000.00 he had loaned the company, consisted of a secured bank loan of $81,197.76 and unsecured debts of $31,173.84, a total of $112,371.60.

The attorneys who were handling the legal details for the purchaser, Tractor Supply Company, notified the creditors of Western Supply of the bulk sale. Bach's letter of November 15, 1973, referred to in the court's memorandum opinion, was apparently mailed by Bach in explanation of the formal notice to creditors. The letter was on Western Supply stationery and sent on behalf of the corporation. It reads:

"As you have been advised recently, certain fixtures and inventory have been sold to Tractor Supply Co., Inc., Chicago, Illinois. This was announced to each of our creditors, as provided for in the Kansas Bulk Sales Act. However, we feel that our creditors may be somewhat misled, due to the poor wording of the notification by Tractor Supply Co. attorneys here in Ottawa, Anderson, Byrd & Richeson. We want you to know the following:

"1. Western Supply Co., Inc., is selling only certain assets to purchaser, and Western Supply is not dissolving the corporation, but will not be involved in the farm supply business, after December 1, 1973.

"2. We feel that every creditor of Western Supply Company will be paid fully by December 15, 1973. Provisions have been made for this by our corporate officers. All debts of the corporation were listed by us, as required by Kansas law, but all assets of Western Supply have not and will not be sold to Tractor Supply, however, proceeds derived by Western Supply from Tractor Supply Co. will be sufficient to pay each of you what we owe you. In effect we will discontinue our farm supply business, and by doing so, will derive cash to pay every creditor we have.

"We want to take this opportunity to thank you for a good product, and wish you the best for the coming new year. If you have any questions, please feel free to contact us until December 15th, at the above address and phone."

When the amount to be paid under the bulk sales agreement

was figured a shrinkage in the merchandise inventory showed up of approximately $18,000.00. Under the previous contract Tractor Supply was obligated and did pay approximately $90,000.00. This was paid into the district court under the bulk transfer provisions of the U.C.C. After the secured claim of the bank was satisfied, there was only $11,620.78 left to pay unsecured claims. According to the court's supplemental memorandum opinion unsecured claims filed in the bulk sales case totaled $56,969.91, instead of the $31,173.84 previously estimated by Bach.

The plumbing and electrical inventory, which was not included in the bulk transfer, was sold over the counter and suffered an even greater shrinkage. It appears this merchandise was sold out and brought slightly under $5,000.00. The amount realized was used to satisfy taxes owed by Western Supply to both the state and federal governments. Accordingly after a total liquidation of the firm's assets there remained only $11,620.78 to pay unsecured claims of $56,969.91 filed in the bulk sales case. This did not include Amoco's claim of $4,495.01.

With this background we turn to the questions raised on appeal. It is argued that there is no basis in the evidence to justify a disregard of the corporate entity and that the court erred in imposing individual liability on the president of the corporation for payment of the corporate debt.

We start with the basic premise that a corporation and its stockholders are presumed separate and distinct, whether the corporation has many stockholders or only one. Debts of a corporation are not the individual indebtedness of its stockholders. However, in an appropriate case the corporate form will be disregarded and the corporation and its stockholders may be treated as identical. (*Kilpatrick Bros., Inc. v. Poynter*, 205 Kan. 787, 473 P.2d 33; *Kirk v. H.G.P. Corporation, Inc.*, 208 Kan. 777, 494 P.2d 1087; *DeWitt Truck Brokers v. W. Ray Flemming Fruit Co.*, 540 F.2d 681 [1976].) Power to pierce the corporate veil is to be exercised reluctantly and cautiously. (*DeWitt Truck Brokers v. W. Ray Flemming Fruit Co.*, supra; 1 Fletcher, Cyclopedia Corporations, Perm. Ed., § 41, p. 166.)

In *Kilpatrick Bros., Inc. v. Poynter*, supra, it is held:

"The corporate entity may be disregarded where it is used as a cloak or cover for fraud or illegality, or to work an injustice, or where necessary to achieve equity. When the corporation is the mere *alter ego* or business conduit of a person, the corporate fiction may be disregarded in the interest of securing a just determination of rights and liabilities.

"The doctrine of *alter ego* fastens liability on the individual who uses a corporation merely as an instrumentality to conduct his own personal business, such liability arising from fraud or injustice perpetrated not on the corporation but on third persons dealing with the corporation. Under it the court merely disregards corporate entity and holds the individual responsible for his acts knowingly and intentionally done in the name of the corporation." (205 Kan. 787, Syl. 4 and 5.)

Mere single ownership of a corporation may tend to generate suspicion regarding interrelated activities involving third parties but single ownership alone will not support the *alter ego* theory and justify a disregard of the corporate entity. (*Kilpatrick Bros., Inc. v. Poynter,* supra, Syl. 6; *Robertson v. Roy L. Morgan, Production Company,* 411 F.2d 1041 [1969].) In this regard it should be noted that statements to the contrary in *Adams v. Morgan,* 142 Kan. 865, 52 P.2d 643, and cases decided before the advent of our present corporation code are disapproved. Under the present law one person may incorporate (K.S.A. 17-6001), the board of directors may be composed of only one member (K.S.A. 17-6301[*b*]) and although 3 officers are required—president, secretary and treasurer—"Any number of offices may be held by the same person unless the articles of incorporation or bylaws otherwise provide." (K.S.A. 17-6302.) There is nothing requiring stock be held by more than one individual.

An examination of the cases discloses that some of the factors considered significant in justifying a disregard of the corporate entity are: (1) Undercapitalization of a one-man corporation, (2) failure to observe corporate formalities, (3) nonpayment of dividends, (4) siphoning of corporate funds by the dominant stockholder, (5) nonfunctioning of other officers or directors, (6) absence of corporate records, (7) the use of the corporation as a facade for operations of the dominant stockholder or stockholders, and (8) the use of the corporate entity in promoting injustice or fraud. There is no evidence in the present record to establish any of these factors. The corporation was operated as a separate entity. The defendant Bach loaned the corporation $85,000.00 of his own funds which he never withdrew. His only receipts from the corporation appear to be a modest annual salary of $2,900.00. There was no evidence that Bach used the corporation to conduct personal affairs or that he wrongfully used corporation funds.

Finally, it would appear that the trial court did not enter the

judgment against Bach on the *alter ego* theory. The debt incurred by Western Supply totaled $4,495.01 and the court determined this to be the amount due Amoco. If the corporate entity had been disregarded under the *alter ego* theory the liability for the entire debt would fall upon Bach, not just a portion. The judgment was entered for only 19.2% of the $4,495.01 or $863.04. The judgment as entered cannot be upheld on the record before us by disregarding the corporate entity and imposing liability upon Bach on the theory of *alter ego.*

Considering the court's references to the letter of November 15, 1973, and the form and amount of judgment awarded by the court the possibility of a tort theory of recovery needs to be examined.

A corporate officer or director acting on behalf of a corporation is personally liable for damages caused by his willful participation in acts of fraud or deceit to one directly injured thereby. (*Kirk v. H.G.P. Corporation, Inc.,* supra, p. 779; *McFeeters v. Renollet,* 210 Kan. 158, Syl. 2, 500 P.2d 47; *Meehan v. Adams Enterprises, Inc.,* 211 Kan. 353, 507 P.2d 849; *State, ex rel., v. Koscot Interplanetary, Inc.,* 212 Kan. 668, Syl. 7, 512 P.2d 416.) A corporate officer or director, actively participating in the fraud practiced on behalf of a corporation, cannot escape personal liability on the ground that he was acting for the corporation or that the corporation obtained the benefit therefrom. (*Russell v. American Rock Crusher Co.,* 181 Kan. 891, 895, 317 P.2d 847; see also 3A Fletcher, supra, § 1143, p. 228; 19 C.J.S., Corporations, § 850, p. 281; 19 Am.Jur.2d, Corporations, § 1386, p. 782.)

Under the authorities cited, in order to support a judgment based upon fraud practiced by Bach as president of the corporation, not only must it be shown that the statements contained in the letter of November 15, 1973, were knowingly false or made in reckless disregard of the truth but also that Amoco omitted filing their claim in the bulk sales case in reliance on the statements in the letter.

There is no evidence in the record of any false representations made intentionally by appellant Bach. His estimates of the value of the merchandise inventory and the amount of the unsecured claims were based on accounts of the corporation prepared by a firm of accountants, Caldwell, Gibbons and Grogan. As later events turned out his statement that every creditor of Western Supply would be fully paid was untrue. He was likewise in error

when he stated the proceeds of the sale to Tractor Supply would be sufficient to pay all the creditors. Bach was questioned at the trial as to these discrepancies. He testified:

"Q. So then, really, Mr. Bach, you knew at the time you wrote the letter to the creditors, of November 15th, you knew that you wouldn't have enough money after payment by Tractor Supply, to pay the unsecured creditors, didn't you.

"A. No.

"Q. Why?

"A. Well, because as the letter states, not all of the inventory was being sold to Tractor Supply, and at that time of the writing of the letter, it was not determinable at that time exactly how much inventory they were going to have.

"Q. Well, you knew it couldn't exceed $84,000.00.

"A. Well, okay, considering the debts to other creditors, other than the unsecured creditors of Peoples National Bank of $82,000.00, including the approximately $31,000.00 that was owed to the unsecured creditors that had an amount of approximately $113,000.00, and according to the agreement that Western Supply Company, Inc., had with the Tractor Supply Company, it could total approximately $108,000.00. As you just stated, that would leave $5,000.00 to be derived from other inventory that Tractor Supply Company was not buying."

The evidence in this case will not support a finding that Bach made the statements in the letter knowing they were false or that he made them in reckless disregard of the truth. It is apparent he was relying on the books of the corporation. He had no conscious knowledge that the books or his statements would turn out to be inaccurate. The falsity or inaccuracy of the statements depended on future events. The amount obtainable for the entire merchandise inventory was not determinable until the sales were completed. Using hindsight, he probably should have known the corporation owed more unsecured claims than $31,173.84 and that the book value of the inventory of the corporation would shrink when it was sold. However, such errors in judgment as to future events will not support a judgment based on a theory of false statements knowingly made or made in reckless disregard of the truth.

In addition we are unable to find any evidence in the record that Amoco relied on the statements in the letter or that the letter was the cause of their failure to file a claim in the bulk sales case. It was admitted they did not file a claim but there is no evidence in the record as to why they failed to do so, other than the testimony of Bach that he mailed the letter to all unsecured creditors. It appears that other creditors holding unsecured claims totaling $56,969.91 were not deterred in filing their claims in the bulk sales case.

One final matter bearing upon the fraud theory of recovery should be mentioned. Fraud is an affirmative matter to be pleaded and proven. There is no mention of fraud in the pleadings or in the pretrial memorandum and no factual basis was alleged from which such might be anticipated. Under the rules of civil procedure fraud is a special matter. The applicable statutory requirement reads:

"(b) *Fraud, mistake, conditions of the mind.* In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other conditions of mind of a person may be averred generally." (K.S.A. 60-209 [b].)

(See also *Weil & Associates v. Urban Renewal Agency,* 206 Kan. 405, Syl. 7, 479 P.2d 875.)

The record filed on appeal will not support a judgment against the president and principal stockholder for the debt of the corporation on the theory of *alter ego* or on the theory of active participation in fraud practiced on behalf of the corporation.

Judgment reversed.