In re MID-WEST METAL PRODUCTS, INC., Debtor.

MID-WEST METAL PRODUCTS, INC., Plaintiff,

v.

Walter SIMPSON, Defendant.

Bankruptcy No. 80–20230–N.

United States Bankruptcy Court, D. Kansas.

July 22, 1981.

John F. Michaels, of Ryder, Rose & Frensley, Kansas City, Mo., G. F. Butler, of Speer, Austin, Holliday, Lane & Ruddick, Chartered, Olathe, Kan., for debtor/plaintiff.

Stephen B. Sutton, of Gage & Tucker, Kansas City, Mo., for defendant.

Geoffrey E. Lind, of Lind & Lind, Kansas City, Kan., for defendant.

Thomas M. Mullinix, Kansas City, Kan., Disbursing Agent.

F. Stannard Lentz, of Hamill, Lentz, Neill & Dwyer, Shawnee Mission, Kan., for Creditors Committee.

## MEMORANDUM OPINION

BENJAMIN E. FRANKLIN, Bankruptcy Judge.

This matter came on for hearing on January 6, 1981, on the objection of the debtor, Mid-West Metal Products, Inc., to proof of claim # 201 of Walter Simpson. Mid-West Metal Products, Inc., was represented by John F. Michaels of the firm of Ryder, Rose & Frensley (G. F. Butler, local counsel). Walter Simpson was represented by Stephen B. Sutton of the firm of Gage & Tucker (Donald E. Bucher, local counsel).

## FINDINGS OF FACT

1. In the spring and summer of 1979, claimant, Walter Simpson, made contact with several of the officers and employees of Mid-West Metal Products, Inc. (hereinafter referred to as "Mid-West"), concerning Mr. Simpson's possible employment. These officers included Nelma J. Andrew, president of Mid-West, and Joseph H. Lawson, treasurer of Mid-West. Nelma J. Andrew and Joseph H. Lawson were also the sole shareholders of Espy, Inc. (hereinafter referred to as "Espy"), a holding company which owned controlling interest of Mid-West.

2. After several discussions, Mr. Simpson negotiated an employment agreement with Ms. Andrew and Mr. Lawson. The agreement was reduced to a writing dated September 4, 1979 (Claimant's Ex. A), which purports to be an agreement between Espy and Walter Simpson. Mid-West is not mentioned in the agreement.

3. The substantive portion of the agreement consists of eight "terms and conditions of employment". The pertinent portions of the "terms and conditions" are as follows:

"1. Mr. Simpson will join the Company as Vice President, Human Resources;

2. Initial base Salary at $36,000.00 per annum;

. . . . .

7. Should Espy, Inc. determine the employment of Mr. Simpson is not satisfactory, for whatever reasons within the next three years, or Mr. Simpson determines, for whatever reasons, within the next three years the employment is not satisfactory, both the Company and Mr. Simpson mutually agree to nullify this instrument, with exception of the following stipulations:

(a) If Mr. Simpson elects to terminate the employment for personal reasons that do not impinge upon the conditions of this agreement, no salary continuance plan will be effective and all benefits will cease.

(b) If Espy, Inc. elects to terminate Mr. Simpson's employment for just cause i. e. blatantly violating the corporate policies, no salary continuance plan will be effective and all benefits will cease.

(c) If the Company and Mr. Simpson mutually agree to terminate employment, Mr. Simpson will receive an amount equal to six months base salary at the rate in effect at the time of nullification, payable monthly. During the salary continuance period, benefits will remain in effect for the incumbent and his family, with the understanding and demonstration that Mr. Simpson is

actively pursuing other employment, all benefits and compensation will cease upon Mr. Simpson's employment."

4. The agreement is signed by Nelma J. Andrew, with the title "CE" (chief executive) following her signature; Joseph H. Lawson, with the title "Pres/Treas." following his signature; and Walter Simpson.

5. The Disclosure Statement filed by the debtor, Mid-West, states that Espy owns 80% of the stock of Mid-West, and that Nelma J. Andrew controls Espy. Ms. Andrew testified that the only other person holding shares in Espy besides herself was Joseph H. Lawson.

6. Espy was incorporated under the laws of Kansas on June 15, 1979. Counsel for claimant, Simpson, contends that the corporate charter of Espy was forfeited on July 15, 1980; that the Kansas Secretary of State's office was later contacted by him, and he was advised that the entry was mistakenly made by the State authorities, but has since been deleted and that Espy's corporate status has been in good standing since its inception in June, 1979.

7. Nelma J. Andrew testified that the only function of Espy was its ownership of controlling interest in Mid-West, and that Espy never had any employees or paid salaries to anyone.

8. Walter Simpson testified that he did not know what Espy was; but that it was mentioned to him prior to the signing of Ex. A that Espy was the holding company for Mid-West; and that he was "very much in a trusting mood to believe that whatever happened, Mid-West Metals would honor" the employment agreement. (Transcript of testimony of Walter Simpson, pgs. 9 and 11).

9. Walter Simpson was employed as the vice-president of Human Resources at Mid-West from September 4, 1979, to May 9, 1980. Mr. Simpson worked on personnel matters at Mid-West, and reported directly to Nelma J. Andrew, president of Mid-West; that he was paid by Mid-West at the rate of $3,000.00 per month.

10. Nelma J. Andrew testified that Walter Simpson never performed any services for Espy.

11. Mid-West filed a Petition for Reorganization under Chapter 11 of the Bankruptcy Reform Act on March 21, 1980.

12. Because of Mid-West's poor financial condition and a restructuring of the company, Walter Simpson was scheduled to be terminated from his work at Mid-West on May 30, 1980. Nelma J. Andrew testified that because of Mr. Simpson's attitude, insubordination, and lateness, this termination date was moved up to May 9, 1980. Mr. Simpson testified that he was never told that his performance was unsatisfactory.

13. Nelma J. Andrew testified that the vacation policy of Mid-West was to allow one week's vacation for employees employed more than one year and less than two years. Walter Simpson testified that "the initial thoughts were" that he was to be paid a vacation entitlement of $1,500.00, which was to become due and payable January 1, 1980. Claimant states in his Proof of Claim that this $1,500.00 represents a two-week paid vacation. Claimant also testified that other benefits were calculated at 16% on top of his gross pay. (Tr. p. 18, lines 9–18).

14. Walter Simpson testified that upon leaving Mid-West, he discussed the salary continuation provisions contained in para. 7 of claimant's Ex. A with Nelma J. Andrew and her attorney, Leonard Rose. Mr. Simpson further testified that he was told that the employment agreement might be invalid, and that Mid-West could not honor the agreement because it had no money to do so.

15. Walter Simpson testified as to an extensive search for other employment, and his acceptance of employment on August 19, 1980.

16. Walter Simpson filed his Proof of Claim # 201 on December 1, 1980, for $14,-508.00, which includes claims for salary, vacation pay, and other benefits. This Proof of Claim superseded claimant's Proofs of

Claim # 58 and # 84, which have been withdrawn by the claimant.

17. Neither claimant nor debtor has alleged that the asserted debt represented by Claim # 201 was incurred after March 21, 1980, the date that debtor filed for relief under Chapter 11 of the Bankruptcy Reform Code.

## ISSUES

I. WHETHER ESPY WAS THE ALTER EGO OF MID–WEST, MAKING MID–WEST LIABLE ON THE AGREEMENT.

II. WHETHER THERE WAS TERMINATION OF THE EMPLOYMENT OF WALTER SIMPSON BY "MUTUAL AGREEMENT", AS THE TERM IS USED IN PARAGRAPH 7 OF THE EMPLOYMENT AGREEMENT.

III. WHETHER WALTER SIMPSON'S CLAIM IS ENTITLED TO PRIORITY TO THE EXTENT OF HIS ALLOWED CLAIM FOR VACATION PAY.

## CONCLUSIONS OF LAW

### I.

Claimant, Walter Simpson, contends that Espy should be treated as the alter ego of the debtor, Mid-West, which would mean Mid-West would be considered as a party to the employment agreement. Claimant asks the Court to make this finding because of claimant's dealings with officers of both Mid-West and Espy in reaching the agreement; claimant was intended to be employed, and in fact was employed, by Mid-West; and because it would be inequitable and a fraud upon claimant if Mid-West is not held to the agreement.

Debtor, Mid-West, contends that the alter ego doctrine is not applicable to the situation here, where a subsidiary (Mid-West) is sought to be held responsible for the contract of its parent (Espy).

Debtor further states that even if the alter ego doctrine could be so applied, the facts here do not warrant disregarding the separate corporate entities of Mid-West and Espy.

Debtor is correct in stating that the usual alter ego situation involves an attempt to hold a parent or an individual liable for the acts of a subsidiary or other corporation, and not vice-versa. Thus, in *Service Iron Foundry v. M. A. Bell Co.*, 2 Kan.App.2d 662, 588 P.2d 463 (1979), the court stated that the alter ego doctrine fastens liability on an individual or corporation which uses a corporate entity merely as an instrumentality to conduct its own business. The separate entity of a corporation can be cast aside, if to recognize the separate entity of a corporation would allow fraud on a third party. The court listed ten factors to be considered in determining whether a parent should be held liable for the debt of a subsidiary. *Service Iron Foundry*, 588 P.2d 463, 473. The factors are generally aimed at determining whether the subsidiary was dominated by the parent, and whether the subsidiary was a business conduit through which the parent did business. Similar factors were used in *Intern. U., United Auto., Etc. v. Cardwell Mfg. Co.*, 416 F.Supp. 1267 (D.Kan.1976); and *Amoco Chemicals Corporation v. Bach*, 222 Kan. 589, 567 P.2d 1337 (1977).

None of these cases, nor the numerous other alter ego cases decided under Kansas law, address the circumstances presented here, where it is the subsidiary that is sought to be held liable.

In the rare situation in which a creditor or claimant seeks to hold a subsidiary or other corporation liable for the acts of its parent or individual owners, the courts speak of "piercing the corporate veil in reverse". Such cases are rare probably because it is usually the parent or the individual owner that is the wealthier and more accessible entity.

In *Kingston Dry Dock Co. v. Lake Champlain Transp. Co.*, 31 F.2d 265 (2d Cir. 1929), the court faced a situation where a subsidiary was sought to be held liable for repairs on the subsidiary's vessels, which repairs had been ordered by the parent corporation.

In his opinion, Judge Learned Hand attempted to apply the usual alter ego tests to the *subsidiary*, and determined that the subsidiary had not become an actor in the transaction or controlled the parent's actions. The opinion concluded:

"... Perhaps it would be too much to say that subsidiary can never be liable for a transaction done in the name of the parent, the situation at bar. Any person may use another as a screen, and one may conceive cases where such an arrangement might exist. But such instances, if possible at all, must be extremely rare, and there is not the slightest evidence of this sort here. Although it is quite true that the two companies were very intimately related, the respondent [the subsidiary] never intended in fact to make the Inland Marine Corporation [the parent] its agent, nor did it interpose in any way in the conduct of its affairs. Rather their relations were reversed, so that the respondent could not have interposed, whatever might be the liability of the Inland Marine Corporation for transactions formally undertaken by the respondent." (*Kingston Dry Dock Co.*, 31 F.2d 265, 267).

In none of the dozen or so other cases found where a party has sought to hold a subsidiary or other corporation liable for the acts of its parent or individual owners, has a court applied the same test that was used by the Second Circuit in the *Kingston Dry Dock Co.* case.

The requirements established by other courts in order to recover in this type of situation varies considerably as seen by the cases cited below.

In *Fitzgerald v. Central Bank & Trust Company*, 257 F.2d 118, (10th Cir., 1958) (case arising from Colorado), a bank made a claim in the estate of a bankrupt corporation for a debt that the president of the corporation owed to the bank. The court found that the president of the corporation dominated and controlled the corporation, and that he incurred the debt while engaging in activities interwoven with the business activities of the bankrupt corporation.

The court did not state a rule that could be followed in other cases of this type, but instead recognized an equitable principle:

"... The conditions under which the corporate entity may be disregarded, or the corporation treated as the alter ego of its members, necessarily vary according to the circumstances of each case. But it may be said in general terms that the doctrine is an equitable one appropriate for application to prevent fraud, injustice, or wrong ..." (*Fitzgerald*, 257 F.2d 118, 120).

The court held that under the facts of the case, that the separateness in legal identity of the corporation and its president's other business activities should be disregarded as a means of preventing fraud, injustice, and wrong. The claim of the bank against the bankrupt corporation was allowed. It is noteworthy that in this bankruptcy case, the Tenth Circuit did not rely on any Colorado state law in determining that the corporate entity of the bankrupt should be disregarded.

The *Fitzgerald* case is analogous to the situation here, where the controlled corporation (Mid-West) is sought to be held liable for the obligations of its majority owner (Espy). The fact that the owner here is a corporation and not an individual would appear not to be significant.

A second case decided by the Tenth Circuit resulted in a corporation being held liable for the taxes of its general manager, who exerted "substantial, if not exclusive" control over the corporation. *G. M. Leasing Corp. v. United States*, 514 F.2d 935 (10th Cir. 1975), affirmed in part and reversed in part of other grounds, 429 U.S. 338, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977). Unlike Mid-West, however, this corporation had no business or employees. Again, the Tenth Circuit cited no state law in determining that the corporation was the taxpayer's alter ego.

Other courts have made clear that, in appropriate circumstances, "piercing the corporate veil in reverse" is proper:

"It is well settled that courts will not be blinded by corporate forms nor permit

them to be used to defeat public convenience, justify wrong or perpetrate fraud, but will look through the forms behind the corporate entities involved to deal with the situation as justice may require. [citations omitted] Not only is this done for the purpose of holding a stockholder or parent corporation for debts created by an insolvent corporate agent or subsidiary which is a mere instrumentality of the stockholder or parent, but also for the purpose of allowing the creditors of the stockholder or parent to reach the assets held by such a subsidiary...." [*Stone v. Eacho*, 127 F.2d 284, 288 (4th Cir. 1942)]. "Finally, it is undisputed that the alter ego doctrine is equitable. [citations omitted]. And despite defendant's protestations to the contrary, the doctrine may be used both in its classic sense, to pierce the corporate veil to impress the debts of a corporation upon an individual, or in a 'reverse' sense, to disregard the corporate form to reach the assets of a corporation for the debts of an individual...." [*Towers v. Titus*, 5 B.R. 786, 795 (N.D.Cal. 1979)].

Some courts have specifically indicated that the usual tests used in alter ego cases should not be used when determining whether to pierce the corporate veil in reverse. In *FMC Finance Corp. v. Murphree*, 632 F.2d 413 (5th Cir. 1980), the court stated at pg. 422:

"The Murphrees are in essence attempting to hold the subsidiary responsible for the acts of the parent. The reversal of the usual configuration—holding the parent liable for the subsidiary's acts—is one of those cases when the usual factors looked to are inappropriate.

.     .     .     .     .

As noted by Judge Learned Hand in *Kingston Dry Dock Co. v. Lake Champlain Transportation Co.*, 351 F.2d at 267, when the attempt is to hold the subsidiary liable for the acts of the parent, there is factually no way that the subsidiary can interpose itself in the conduct of the parent's affairs. Abandonment of the total domination or "instrumentality" fac-

tor is clearly required in cases seeking to hold the subsidiary liable for the acts of the parent. It is more appropriate in these cases to require, as a necessary but not sufficient condition for finding liability, only that there be a control relationship between the parent and the subsidiary...."

Similarly, in *Pacific Development, Inc. v. U. S.*, 79–1 U.S.T.C. ¶ 9138 (U.S.D.C. Col.1979), the Court stated at page 86,124:
" 'Reverse' piercing the corporate veil—that is, disregarding the corporate form to reach assets of a corporation for debts of a shareholder—is clearly permissible where justice so requires. [citations omitted] However, the reverse piercing paradigm may alter certain factors included in the traditional test....

Accordingly, the court cannot mechanically apply the traditional tests to the facts of this case, but must engage in the sensitive process of assessing the relationship between PDI and Park to determine whether the corporate form was used in violation of public policy and to thwart the beneficial goals of incorporation."

In sum, the decisions have been relatively liberal in disregarding the corporate entity in order to hold a corporation liable for the obligations of its parent or individual owner, as compared to standards used in disregarding the corporate entity in order to hold the parent or owner liable for the subsidiary's obligations. In none of the reverse piercing of the corporate veil cases found was it stated as a requirement that one entity dominate the other, as is frequently required in order to hold the parent or owner liable in the usual alter ego situation.

■ The Court finds under the facts of this case, there are several justifications for disregarding the separate corporate entities of Espy and Mid-West.

(1) The titles attached to the signatures to the agreement indicate that Nelma J. Andrew and Joseph H. Lawson may have in fact signed as officers of Mid-West, and not as officers of Espy. Ms. Andrew signed

the agreement as "CE", meaning chief executive (transcript of testimony of Nelma J. Andrew, p. 47, line 18). This was done even though Espy had no employees and engaged in no transactions, other than owning a controlling interest in the stock of Mid-West. Such a holding company is in little need of a "chief executive". On the other hand, it has been established in this and other proceedings involving this debtor that Ms. Andrew has been the chief executive officer of Mid-West.

Joseph H. Lawson signed the agreement as "Pres/Treas." According to the testimony of Ms. Andrew, Joseph H. Lawson never was the president or treasurer, nor was he any other officer, of Espy (tr. pg. 42, lines 4–18). However, Mr. Lawson was the treasurer of Mid-West at this time (tr., pg. 47, lines 12–15).

The Court further finds that Nelma J. Andrew and Joseph H. Lawson signed the agreement in their capacities as officers of Mid-West, and intended to do so. Thus, Mid-West is a party to the contract, even though it was not named in the body of the contract. 17 Am.Jur.2d *Contracts* § 295; *Stoutz v. Wilson Motor Co.*, 176 Okl. 316, 55 P.2d 990 (1936). There is no Kansas law either way on this question.

The Court further finds from the use of the various titles by Ms. Andrew and Mr. Lawson that it was reasonable for the claimant to be confused as to the two corporations and the relation of the officers to them. This type of confusion has been recognized long ago in Kansas as a basis for disregarding the separate legal entities of parent and subsidiary:

"... But if the corporate business of the subsidiary and that of the parent company are so hazily confused that the officials themselves do not know which is which, the legal fiction of separate corporation entities evaporates...." [*Cities Service Co. v. Koeneke,* 137 Kan. 7, 20 P.2d 460, 471 (1933)].

(2) The Court further finds that it is undisputed that claimant was hired to work at Mid-West by officers of Mid-West; that claimant did in fact work for Mid-West, and

was paid by Mid-West at the rate set out in the agreement; further that Espy never had any employees, nor did it have any function other than as holding company for Mid-West; and that Espy never executed any terms of the agreement with claimant. Considering this, claimant's testimony that he possibly would not have accepted employment with Mid-West without the "protection" of the employment agreement is credible.

Although no case decided under Kansas law has addressed a reverse piercing of the corporate veil situation, the following general principles and equitable rules would appear to apply to this case:

"... Kansas Supreme Court decisions have always been liberal in indicating a 'tendency to disregard the theory of a corporation as an entity separate from its corporators where justice between the real parties to the transaction requires it. [citations omitted] ..." *Intern. U., United Auto., Etc. v. Cardwell Mfg. Co.,* 416 F.Supp. 1267 (D.Kan.1976)].

"While the power to pierce the corporate veil is to be exercised reluctantly and cautiously, ... the corporate entity can be disregarded if it is used to cloak or cover fraud or illegality or to work injustice, or if necessary to achieve equity...." [*Service Iron Foundry v. M.A. Bell Co.,* 2 Kan.App.2d 662, 588 P.2d 463, 473 (1979)].

The Court further finds from the evidence in this case, that claimant was not hired to work for Espy, but for Mid-West; that Ms. Andrew and Mr. Lawson were acting on behalf of Mid-West in hiring claimant; that the equities clearly favor ignoring the corporate entities of Mid-West and Espy as to this agreement; that justice and the sense of fair play require that Mid-West be held to the agreement. Therefore, the corporate distinction between Mid-West and Espy should be disregarded, and the obligations of Espy under the agreement should be treated as the obligations of Mid-West.

## II.

Mid-West alleges that even if it is charged with liability for the agreement, a condition precedent to its liability has not been met.

Paragraph 7 of the agreement, set out above, contemplates three circumstances under which claimant's employment would be terminated: "(a) If Mr. Simpson elects to terminate the employment for personal reasons that do not impinge upon the conditions of this agreement, . . .; (b) If Espy, Inc. elects to terminate Mr. Simpson's employment for just cause i. e. blatantly violating the corporate policies, . . .; and (c) If the Company and Mr. Simpson mutually agree to terminate employment, . . ." Only under 7(c) would Mr. Simpson receive salary and benefits continuance for a period of six months, or until Mr. Simpson became employed again, whichever occurrence came first. Mid-West contends that claimant's termination does not fall within the ambit of 7(c).

It is undisputed that Mid-West intended to terminate Mr. Simpson on May 30, 1980, because of Mid-West's financial problems and an extensive reduction in the total labor force of the company. It is disputed however, as to why the termination date was moved up to May 9, 1980. Claimant testified that on May 5, 1980, he was told by Ms. Andrew that he would be laid off on May 9, and not on May 30th, because of Mid-West's financial condition. Ms. Andrew testified that the termination date was accelerated to May 9th because of the attitude and insubordination of Mr. Simpson. Clearly then, the circumstances under which Mr. Simpson was terminated is an important question of fact for the Court, and both parties testified in their own behalf, thus giving the Court the opportunity to observe their demeanor, manner of testifying, and all other circumstances concerning the termination of the claimant.

█ The Court finds that there was no evidence that Mr. Simpson was insubordinate prior to April, 1980. Mr. Simpson's uncontradicted testimony was that he was evaluated by Mid-West as an "outstanding performer" on December 3, 1979.

The Court further finds that Mid-West is bound by the employment agreement, and the conditions stated in paragraph 7(c) have been satisfied. Mr. Simpson's Proof of Claim # 201 states that he was owed $11,-300.00 for "base salary from the 9th day of May, 1980, to the 10th day of August, 1980, at the rate of Three Thousand Dollars and No Cents per month. . ." On the face of claimant's claim, then, claimant is seeking his base pay of $3,000.00 per month for a period of almost exactly three months. This totals $9,000.00, and not $11,200.00 as claimant alleges. Thus, this portion of the claim should be allowed in the amount of Nine Thousand ($9,000.00) Dollars.

Under paragraph 3 of the agreement, Walter Simpson was to receive company benefits provided to other executives and their families. The undisputed testimony of Mr. Simpson was that benefits "were calculated at approximately 16 per cent on top of the $3,000 per month. . ." (tr., pg. 18, lines 9–18). The Court finds, therefore, that the benefits, valued at 16 percent of pay, should be allowed in the amount of $1,440.00, and not $1,708.00 as claimant alleges.

## III.

Claimant has requested that the full amount of his claim for vacation pay be granted priority under § 507(a)(3) of the Bankruptcy Reform Act. This section states in pertinent part as follows:

"§ 507. Priorities.

(a) The following expenses and claims have priority in the following order:

.      .      .      .      .

(3) Third, allowed unsecured claims for wages, salaries, or commissions, including vacation, severance and sick leave pay—

(A) earned by an individual within 90 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first; but only

(B) to the extent of $2,000 for each such individual."

Simpson does not base his claim for vacation pay on the agreement. Instead, he contends that a vacation entitlement of $1,500.00 became due and payable on January 1, 1980. This represents a two-week vacation entitlement at base pay. Claimant has not alleged or testified to any specific agreement with Mid-West or Espy that would entitle him to any vacation or vacation pay.

■ The uncontradicted testimony of Ms. Andrew was that Mid-West's company policy was that an employee became entitled to one week's vacation only after working at Mid-West for one year. Mr. Simpson worked for Mid-West for less than one year, even if the salary continuance period is taken into account. Based upon the evidence presented, it is the opinion of this Court that this company did not agree to give a 2-week vacation pay to an employee who has only worked for four months. Therefore, this Court finds that the claimant, Simpson, is not entitled to the $1,500.00 vacation pay; and that portion of the claim should be denied and the debtor's objection sustained.

The following are the condensed, summarized findings of the Court:

(a) The debtor's objection to the claim of Mr. Simpson for base salary from May 9, 1980, to August 10, 1980, should be overruled and said claim will be allowed as a general unsecured debt in the amount of Nine Thousand ($9,000.00) Dollars; and that the claim for benefits to the claimant and his family shall be allowed in the amount of One Thousand Four Hundred Forty ($1,440.00) Dollars, for a total of Ten Thousand Four Hundred Forty ($10,440.00) Dollars;

(b) The debtor's objection to the $1,500.00 for two-weeks vacation pay should be sustained.

THIS MEMORANDUM SHALL CONSTITUTE MY FINDINGS OF FACT AND CONCLUSIONS OF LAW UNDER BANKRUPTCY RULE 752 AND RULE 52(a) OF THE FEDERAL RULES OF CIVIL PROCEDURE.