**BIOCORE, INC. and BioCore Medical Technologies, Inc., Plaintiffs,**

v.

**Hamid KHOSROWSHANI and Margaret Callaci, Defendants.**

**Hamid Khosrowshani and Margaret Callaci, Plaintiffs,**

v.

**Biocore, Inc., et al., Defendants.**

**Civ. A. Nos. 98–2031–KHV, 98–2175–KHV.**

United States District Court, D. Kansas.

Jan. 5, 1999.

Joseph W. Hemberger, Daniel B. Denk, Michael M. Shultz, Ryan B. Denk, McAnany, Van Cleave & Phillips, P.A. Kansas City, KS, BioCore Medical Technologies, Inc., BioCore, Inc., Topeka, KS, for Plaintiffs.

David W. Hauber, Boddington & Brown, Chtd., Kansas City, KS, Timothy F. Butler, New York City, Thomas A. Butler, Butler, Fitzgerald & Potter PC, New York City, Ruth M. Benien, Benien Law Offices, Chtd., Kansas City, KS, for Defendants.

Hamid Khosrowshahi, Tarrytown, NY, pro se.

### *MEMORANDUM AND ORDER*

VRATIL, District Judge.

This matter comes before the Court on plaintiffs' *Motion For Partial Judgment On The Pleadings On [Defendants'] Accounting Claim And On All Claims Against Manoj And Ritu Jain* (Doc. # 345) filed September 17, 1998; plaintiffs' *Motion To Reconsider Court's Decision On Choice Of Law* (Doc. # 378) filed October 13, 1998; plaintiffs' *Motion For Summary Judgment On Choice Of Law And Statute Of Limitations*, (Doc. # 400) filed October 21, 1998; and plaintiffs' *Motion For Summary Judgment* (Doc. # 442) filed November 16, 1998; as well as defendants' *Motion To Strike The Reply Memorandum In Support Of Plaintiffs' Motion for Judgment On Choice Of Law And Statute Of Limitations* (Doc. # 474) filed December 1, 1998 and the *Memorandum In Support of Defendants' Motions For Summary Judgment On Plaintiffs' Unauthorized Contract Claims* (Doc. # 444) filed

November 16, 1998, which the Court construes as a motion for summary judgment.[1]

## Motion For Judgment On The Pleadings Standard of Review

A motion for judgment on the pleadings under Fed.R.Civ.P. 12(c) is governed by the same standards as a motion to dismiss under Rule 12(b)(6). *Mock v. T.G. & Y. Stores Co.*, 971 F.2d 522, 528 (10th Cir. 1992). In reviewing a Rule 12(c) motion, the Court assumes the truth of plaintiffs' "well-pleaded factual allegations" and draws all reasonable inferences in their favor. *Shaw v. Valdez*, 819 F.2d 965, 968 (10th Cir.1987); *see Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The issue in reviewing the sufficiency of plaintiffs' complaint is not whether they will prevail, but whether they are entitled to offer evidence to support their claims. *Scheuer*, 416 U.S. at 236, 94 S.Ct. 1683. Although plaintiffs need not precisely state each element of their claims, they must plead minimal factual allegations on those material elements that must be proved. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir.1991).

## Summary Judgment Standard

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. A "genuine" factual dispute requires more than a

mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505.

The moving party bears the initial burden of showing that there is an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Securities, Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir.1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. *Applied Genetics*, 912 F.2d at 1241.

"[W]e must view the record in the light most favorable to the parties opposing the motion for summary judgment." *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.*, 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. *Anderson*, 477 U.S. at 250–51, 106 S.Ct. 2505. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 793 (10th Cir.1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505.

---

1. For the sake of consistency and clarity, the Court adopts the party alignment in Case No. 98–2031 and refers to BioCore, Inc. and BioCore Medical Technologies, Inc. as plaintiffs and Hamid Khosrowshahi as defendant. Because of their identity of interest with Bio-

Core and BioCore Medical Technologies, the Court also refers to BioVet, Inc., BioFoods, Inc., Manoj Jain and Ritu Jain as plaintiffs, even though they are actually defendants in Case No 98–2175 and are not parties in Case No. 98–2031.

## Summary Judgment Facts

BioCore, Inc. [BioCore] develops and markets collagen products which promote the healing of wounds. BioVet, Inc. [BioVet] and BioFoods, Inc. [BioFoods] are subsidiaries of BioCore. Manoj Jain [Jain] is a member of the board of directors and chief executive officer for all three corporations, and a shareholder in BioCore. Ritu Jain, his wife, was a member of the board of directors of BioCore and BioCore Medical Technologies, Inc. [BMT] until November of 1996, and served as treasurer of BioCore.

In November of 1993, Jain agreed to employ Hamid Khosrowshahi as vice president of BioCore. As part of the negotiations, which occurred in New York, Jain promised that Khosrowshahi would receive a ten percent interest in BioCore and an annual salary of $120,000.00.[2] Khosrowshahi started work in April of 1994 and around this time, Jain told Khosrowshahi that he was a shareholder in BioCore.

In late 1995, Jain agreed to employ Khosrowshahi as president of BMT, which was to be incorporated in January of 1996. Jain promised that upon accepting the position, Khosrowshahi would receive a ten percent interest in BMT.[3] Khosrowshahi assumed the position in January of 1996 and around this time, Jain told Khosrowshahi that he was a shareholder in BMT. Through June of 1997, Jain continued to tell Khosrowshahi that he was a

shareholder in BioCore and BMT. In 1996, the parties discussed taking BMT public and Jain repeatedly told Khosrowshahi that he would benefit from doing so because he was a shareholder.

Khosrowshahi had no written employment contract with BioCore or BMT, and they have no corporate records which confirm any agreement to pay him an annual salary of $120,000.00 or, later, to increase his salary to $150,000.00. Similarly, the corporations have no records which reflect any stock conveyance or any promise to convey stock to Khosrowshahi. Jain in fact had no authority to convey BioCore stock to third persons. Sam Campbell, an investor and former member of the board of directors of BioCore, has no recollection that Khosrowshahi was to receive a ten percent ownership interest in BioCore.

In June of 1997, Khosrowshahi resigned from BioCore and BMT and demanded his ten percent interest in both corporations, along with back pay and expenses. Khosrowshahi wrote a resignation letter which objected to the way Jain was running BioCore. Khosrowshahi did not allege that BioCore was engaged in illegal activity and indeed, before he resigned, Khosrowshahi did not tell any of plaintiffs' officers or directors that BioCore or BMT were violating federal or state law.[4] Campbell and Jain unsuccessfully tried to dissuade Khosrowshahi from resigning.

As part of his job duties, Khosrowshahi helped prepare financial reports and rec-

---

2. For purposes of this motion, because the parties have provided conflicting evidence, the Court assumes that Jain and Khosrowshahi negotiated and entered into the contract in New York. Under Rule 56, the Court must view the evidence in the light most favorable to the non-moving parties, which on plaintiffs' *Motion For Summary Judgment On Choice Of Law And Statute Of Limitations* (Doc. # 378) and *Motion For Summary Judgment* (Doc. # 400) are defendants. Plaintiffs' motion to reconsider (Doc. # 378) asks the Court to reconsider its earlier *Memorandum & Order* (Doc. # 374), which found that plaintiffs had failed to properly controvert defendants' allegation that the parties negotiated the contract in New York. Even if the Court finds that plaintiffs had properly controverted defen-

dants' allegation, it still must view the facts in the light most favorable to defendants as the nonmoving parties. The motion to reconsider is therefore denied as moot.

3. In the *Pretrial Order*, Khosrowshahi alleges that plaintiffs also promised him a $30,000.00 raise. In their motion, plaintiffs deny making such a promise, and Khosrowshahi does not address the issue. The Court therefore finds, for purposes of this motion, that plaintiffs made no such promise.

4. Defendants dispute this fact but only cite evidence that plaintiffs were involved in illegal activity. Defendants do not provide evidence that Khosrowshahi communicated this information to plaintiffs before he resigned.

ords and tax returns.[5] He had no check signing authority and only limited authority to negotiate contracts for either Bio-Core or BMT. Khosrowshahi had authority to negotiate contracts, but not to finalize contracts or otherwise obligate BioCore or its subsidiaries. On January 22, 1996, BMT adopted a corporate resolution which stated that no person was authorized to spend, negotiate or oblige BMT in any way financially without the written consent of the board of directors, the chairman of the board or the vice-president of finance. It also required BMT employees, including Khosrowshahi, to submit written requests for expenditures over $500.00, for approval by the BMT board of directors, chairman of the board or vice president of finance. Khosrowshahi did not believe, however, that he had only limited authority to contract on behalf of BioCore or BMT.[6] Also, Tim Metz, BioCore's general counsel, was unaware of the BMT corporate resolution which limited expenditures.

Plaintiffs claim that Khosrowshahi entered into nine contracts that violated the foregoing limitations on his authority:

*Contract between BioCore and Plasystems.* Plasystems Inc. manufactures packaging materials. In 1995, BioCore was looking for a new packaging design and established a packaging committee which included Swaren Jain (Jain's uncle) and Sanjiv Jain (Jain's brother) but not Khosrowshahi. On January 17, 1996, BioCore ordered $15,720.00 worth of clam shell trays from Plasystems. On June 26, 1996, it placed a second order, for $7,650.00 worth of materials. Khosrowshahi's name is not on either order. Kamal Ghandi requested the first order and Sanjiv Jain placed the second order.[7] On December 15, 1997, BioCore disputed its bill by arguing that BioCore products had been broken in shipping, due to Plasystems' packaging, and that it was entitled to a setoff for the value of the damaged goods. Bio-Core did not claim, however, that the contract was unauthorized.

*Contract between BioCore and Farnam.* Sharat Jain (Jain's father) was president of BioVet. He handled all activities relating to Farnam, a veterinary medical products distributor which distributed BioVet collagen products under the "Collamed" brand name. In 1996, customers complained about Collamed products and BioVet decided to take back defective products from Farnam. Khosrowshahi was not involved in BioVet's actions or decisions regarding Collamed, and he was not aware of those matters.

*Contract between BioCore and Dana Moore.* Khosrowshahi negotiated contracts for all BioCore sales representatives, including Dana Moore, an independent non-salaried representative for the New England sales territory. Moore contracted with BioCore in 1994 and Byron Frye, plaintiff's director of new territory development, renewed the contract on April 5, 1996. Moore's renewal contract contained a buy-out provision which detailed that BioCore would acquire Moore's interest in the New Hampshire, Maine, Connecticut, and Vermont territories, leaving Moore with only the Massachusetts territory.[8] The renewal contract super-

---

5. Defendants dispute this fact, citing evidence that an accounting firm prepared plaintiffs' tax returns. Such evidence does not show that Khosrowshahi was uninvolved in the process, however, and logic dictates that the accounting firm needed assistance from someone with knowledge of plaintiffs' finances. The Court finds that this point is not genuinely disputed.

6. Defendants provide a memo from Tim Johnson, the comptroller of BioCore, which notes that orders over $1,000.00 needed Khosrowshahi's approval. The memo suggests that Khosrowshahi had authority to contract beyond the $500.00 limit. Defendants also provide a memo from Cal Roberts, but the Court can not determine how the memo suggests that Cal Roberts believed Khosrowshahi had unlimited authority to contract.

7. The parties have not identified who these individuals are or what their responsibilities were.

8. To acquire these territories, BioCore paid Moore four installments of $515.00 each.

seded all prior agreements and contained the buy-out provision pursuant to which BioCore made four buy-out payments, on April 19, July 19, and November 12, 1996, and January 17, 1997. In April of 1997, BioCore hired a salaried representative for the New England territory and terminated its remaining agreement with Moore.

*Contract between BioCore and Health Management Publications.* Health Management Publications, Inc. ("Health Management") is an advertising agency that publishes a number of wound care magazines and sponsors regional and national seminars. BioCore has done business with Health Management since April of 1994, participating in its conventions and advertising in its trade journals. BioCore considered the Health Management conferences to be the most important in the industry, and Jain attended at least three of them.[9] Jain knew that BioCore participated in regional wound management seminars, and helped design BioCore's exhibits for the seminars. BioCore attended several regional seminars in 1996 and decided to increase its participation in 1997. Khosrowshahi and Jain decided which seminars to attend, and on November 7, 1996, Khosrowshahi told Health Management that BioCore intended to participate in six regional seminars in 1997. Jain did not know, however, what financial commitments Khosrowshahi had made to Health Management. On May 21, 1997, Health Management informed BioCore that three invoices for advertising and seminar participation were outstanding. On October 27, 1997, Health Management informed BioCore that it owed $29,435.00. On December 5, 1997, BioCore again received a bill from Health Management. On December 15, 1997—shortly before it filed suit—BioCore first claimed that its contracts with Health Management might have been unauthorized.

9. In April of 1994, Jain told Health Management that its conferences were the best in the country and that as sales increased, BioCore would participate more.

*Contract between BioCore and International Features.* International Features owns *BioMechanics* magazine. BioCore had a history of advertising in *BioMechanics* and in 1996, it received a unique opportunity to participate in developing a wound care section for the magazine. BioCore was able to control all of the articles in the wound care section in exchange for advertising in all of the issues which carried the section. BioCore purchased the requisite advertising; consequently, only BioCore articles were published in the wound care section and BioCore advertisements received prime placement in the magazine. In addition, *BioMechanics* published wound care articles by BioCore employees. Khosrowshahi discussed the *BioMechanics* plan with Jain but not the financial commitment that BioCore would make. In 1997, Khosrowshahi and Jain discussed renewing BioCore's participation with *BioMechanics*. Jain approved the renewal.

*Contract between BioCore and Arastoo.* Arastoo, Inc. is a Middle East company that has been involved in distributing medical products for over 40 years. Arastoo does business with large pharmaceutical companies such as Hoffman–LaRoche, Ciba–Geigy and Merck. Dr. Akbarieh is a principal of Arastoo and also Khosrowshahi's second cousin. In 1992, Jain asked Khosrowshahi to contact Dr. Akbarieh to see whether BioCore products had a market in the Middle East. In 1994, Khosrowshahi entered into an agreement with Arastoo to conduct a market research study.[10] On December 29, 1994, Jain signed a $50,000.00 check in full payment for Arastoo services. Jain claims that he occasionally signed blank checks, however, and that he did not knowingly sign a $50,-000.00 check to Arastoo.

*Contract between BMT and Southard Communications.* Southard Communica-

10. The evidence does not show whether Khosrowshahi entered into this contract personally or on BioCore's behalf. Given the context of the litigation and surrounding evidence, the Court assumes that Khosrowshahi obligated BioCore on the contract with Arastoo.

tions, Inc. is a public relations firm. In late 1996, pursuant to instructions from Khosrowshahi, BMT entered into a contract to pay Southard Communications $6,500.00 a month for public relations services. Tim Metz, BioCore's general counsel and secretary, executed the contract for BMT. At the time BMT entered into the contract, the $500.00 limit was in effect. BMT received services under this contract and pursuant to the terms of the contract, paid at least $13,000.00 to Southard Communications.[11] Jain and Khosrowshahi had met with Bill Southard in New York in the spring of 1996, and as part of the contract Southard flew to Kansas to meet with Jain.

*Contract between BMT and Jack Pivar.* In the spring of 1996 Jack Pivar, a Medicare reimbursement consultant, came to Kansas to meet with Jain and Khosrowshahi to discuss consulting arrangements. Pursuant to instructions from Jain, on May 15, 1996, Khosrowshahi executed a consulting agreement with Pivar on behalf of BMT. Metz, BioCore's counsel, reviewed the contract, but Jain claims that he was unaware of the financial commitments Khosrowshahi made to Pivar. Pivar provided consulting services through December of 1996, but BioCore terminated the agreement in January of 1997.

*Contract between BMT and BioCompressions.* BioCompressions, Inc. is a New Jersey based company that markets and distributes medical products. In the fall and winter of 1996, Khosrowshahi and Jain had numerous discussions about entering into a distribution agreement with BioCompressions. Jain told Khosrowshahi to move as expeditiously as possible to bring BioCompressions on board, and said that he wanted BioCompressions to begin distributing BioCore products by January 1, 1997. In November of 1996, BioCom-

pressions exhibited BioCore product at its trade shows, even though it had no contract with BioCore. Khosrowshahi also met with BioCompressions in New Jersey. In December of 1996, Jain and Khosrowshahi met with BioCompressions personnel and Ted Fattoross, a BioCore consultant, in the BioCompressions office in New Jersey. At the meeting, Jain announced that Fattoross would be BioCore's "point man" on the negotiations. Fattaross reported directly to Jain, who participated in the contract negotiations with BioCompressions. Fattaross participated with Metz in drafting the agreement. In February of 1997, Metz sent a copy of the contract to BioCompressions. Jain continuously complained that the contract had not been executed and in March of 1997, Khosrowshahi executed the contract. In June of 1997, at a meeting which did not include Khosrowshahi, representatives from BioCore and BioCompressions discussed contract disputes. After the meeting, BioCore decided to move forward with the BioCompressions contract.[12]

From April 1994 through August 1997, plaintiffs employed Margaret Callaci, Khosrowshahi's wife, as a sales representative for BioCore and BMT. Jain and Callaci struck their employment agreement in Tarrytown, New York.

On July 10, 1997, less than three weeks after resigning from BioCore, Khosrowshahi accepted a job with Integra LifeSciences Corporation [Integra], a BioCore competitor. Integra hired Khosrowshahi as a consultant to develop a collagen based wound injury business.

Jain and Ritu Jain are citizens of Kansas, and BioCore and BMT have their principal places of business in Topeka, Kansas. Jain traveled to New York to conduct business and meet with Khosrowshahi.[13] As previously noted, Ritu Jain

---

11. Khosrowshahi cites evidence of only two checks for monthly payments.

12. Plaintiffs assert that this is inadmissible hearsay because the evidence comes from Khosrowshahi's affidavit. Khosrowshahi is not testifying, however, about a statement by

someone else. Because there is no statement made by another person, there is no hearsay. *See* Fed.R.Evid. 801.

13. Defendants do not allege any specific visits other than when Jain negotiated and entered into the contracts with Khosrowshahi.

was treasurer of BioCore and a member of its board of directors, and she also went to New York to conduct business on behalf of BioCore and BMT.

Plaintiff corporations have been incorporated with all of the formalities required by law. They have used outside accounting firms for their financial operations and have employed corporate and patent attorneys to assist their operations. BMT, BioVet and BioFoods have been adequately capitalized, and BioCore and BMT each have been capitalized in an amount not less than $300,000.00.[14] BioCore has made payments for carpet, a construction loan, and a down payment on the Jains' house; a BMW automobile leased in Jain's name but driven by Ritu Jain for personal, family and household use; and a Lexus automobile leased in Jain's name but driven by his parents.[15] While Jain maintains separate bank accounts and credit cards for the corporations and himself,[16] he uses personal credit cards for BioCore business expenses, pays credit card bills with BioCore funds, and cannot separate personal and business expenses. All payments from BioCore to Jain, however, are pursuant to established "corporate policy."

In this suit, plaintiffs claimed that Callaci received both a $250.00 monthly car allowance, and reimbursement for automobile expenses, and that she therefore received double payment for which they were entitled to reimbursement. Callaci asserted counterclaims against BioCore and BMT, alleging that they had breached a contract to pay her certain wages, wrongfully terminated her employment in violation of ERISA, breached express and implied contracts of employment, and committed retaliatory discharge in violation of state law, and that they also were liable under theories of unjust enrichment and Kansas and New York wage statutes. Since the date of the pending motions, however, Callaci, BioCore and BMT have settled all of the claims between them. In that respect their respective motions are moot and the Court does not address them further.

Plaintiffs originally claimed that Khosrowshahi had converted a company vehicle, made unauthorized corporate loans to himself, and misappropriated funds by fraudulently reimbursing himself for air travel expense that he did not incur. Also, Khosrowshahi originally claimed that plaintiffs were liable for breach of agreements to reimburse him for employment expenses. These claims have now been resolved by agreement and the Court does not address them further. Khosrowshahi has also withdrawn any independent accounting claim, and the Court does not address it further.

In addition, Khosrowshahi originally sought specific performance of his stock

14. Defendants dispute this fact, alleging that Jain and Ritu Jain have "improperly impinged" on the capitalization of the corporations, to their detriment. Defendants do not allege, however, that either corporation has been inadequately capitalized.

15. Defendants provide a receipt which shows a purchase of diapers and other personal expenses, alleging that BioCore paid for these items. The photocopy is partially unreadable, however, and the Court can find no indication that BioCore paid for the items listed. Defendants also provide a BioCore check which allegedly paid Jain's personal property taxes. The check does not indicate what it paid for. Defendants provide a real estate tax invoice, but it is for a different amount than the indicated tax bill and it was paid before the BioCore check was written. The invoice does not indicate that BioCore paid the taxes. Defendants also allege that BioCore paid for homeowner's insurance for the Jains, but the documents they provide never indicate that BioCore paid the premiums. Defendants allege that BioCore paid travel expenses for the Jain children, but again, while the documents show that the Jain children incurred travel expenses, nothing shows that BioCore paid for the bills.

16. Curiously, Jain's affidavit differs from his testimony at his deposition, where he testified that BioCore did not have any credit cards. Instead, he testified he personally had two credit cards which he used "as [he] pleased." The Court recognizes that this evidence is not necessarily self-contradictory, as it is possible that while BioCore did not have a separate credit card, BMT, BioVet, or BioFoods did.

and salary contracts agreements with plaintiffs. Plaintiffs argue that Khosrowshahi is not entitled to specific performance on the alleged contracts because he has an adequate remedy at law. Khosrowshahi does not oppose plaintiffs' motion for summary judgment on this issue and the Court finds that summary judgment for plaintiffs is appropriate. *See* Fed. R.Civ.P. 56(e).

### Remaining Claims of the Parties

Plaintiffs now claim that Khosrowshahi (1) converted personnel files and other records from their offices in Topeka; (2) misappropriated funds by entering into the contract with Arastoo which cost plaintiffs $50,000.00 and for which they received nothing in return; (3) entered into nine unauthorized contracts (including the Arastoo contract); (4) breached an agreement not to compete with plaintiffs for two years after leaving plaintiffs' employment; (5) breached plaintiffs' trademark rights, along with federal unfair trade practice laws, by using plaintiffs' trademarks; (6) breached fiduciary duties which he owed as a corporate officer of plaintiffs; (7) violated the Kansas Uniform Trade Secrets Law, K.S.A. § 60–3320, by acquiring and misappropriating plaintiffs' trade secret information; (8) engaged in unfair competition in violation of the common law by competing with plaintiffs and misappropriating their trade secrets; and (9) tortiously interfered with plaintiffs' business and potential economic advantage by misappropriating their trade secrets and using their trademarks.

Khosrowshahi alleges that plaintiffs are liable for (1) breach of agreements to make him a ten percent shareholder in BioCore and BMT, pay him $120,000.00 plus benefits in 1993, and raise his salary to $150,000.00 in 1996; (2) breach of express and implied contracts of employment; (3) unjust enrichment, based on their failure to pay unpaid wages, benefits, and stock shares; and (4) violations of Kansas and New York state wage claims, also based on their failure to pay wages, benefits, and stock shares.

The parties have brought various motions for judgment on numerous claims, all as set forth below.

### Analysis

#### I. Plaintiffs' Motions

■ Khosrowshahi alleges that BioCore and BMT are liable on each claim for relief and that in addition to the corporate defendants, Jain and Ritu Jain are personally liable as alter egos of BioCore and BMT or under other theories which allow him to pierce the corporate veils. *See Pretrial Order* (Doc. # 421) at 17. Plaintiffs claim that Jain and Ritu Jain are entitled to partial judgment on the pleadings because K.S.A. § 17–7101(b) bars any claims against them in their personal capacities. Plaintiffs also argue that they are entitled to summary judgment on all breach of contract claims because K.S.A. § 60–512(1) imposes a three-year statute of limitations for actions on unwritten contracts.[17] Plaintiffs further claim that they are entitled to summary judgment (1) on Khosrowshahi's breach of contract claims regarding the untransferred stock and wages, because his claims are not credible; (2) on his claims for breach of certain employment contracts, because Khosrowshahi has abandoned those claims; and (3) on his claims for unjust enrichment and

---

**17.** Defendants assert that in the *Memorandum and Order* (Doc. # 374) filed October 8, 1998, the Court held that New York law applies to the Khosrowshahi contract claims. The order actually held that New York law applied for purposes of plaintiffs' earlier summary judgment motion, based on the facts properly established on the record at that time. *See Memorandum and Order* at 15. This ruling is not dispositive for the remaining litigation. The Court denied plaintiffs' motion for summary judgment on the choice of law issue, but in the present order it will determine choice of law issues based upon the facts properly established in the record; it is not bound to apply New York law. *See* Fed.R.Civ.P. 54(b); *United States v. Simons*, 129 F.3d 1386, 1390 (10th Cir.1997) (undisputed fact for summary judgment purposes is not binding); *City of Chanute v. Williams Natural Gas Co.*, 955 F.2d 641 (10th Cir.1992); *Lindsey v. Dayton–Hudson Corp.*, 592 F.2d 1118 (10th Cir.1979).

violation of state wage statutes, because Khosrowshahi has received what he is owed.

## A. Personal Capacity Claims Against Jain and Ritu Jain

As noted above, Khosrowshahi brings all claims against Jain and Ritu Jain, arguing that they are personally liable as alter egos of BioCore and BMT or under other theories which allow him to pierce the corporate veils. Plaintiffs claim that K.S.A. § 17–7101(b) bars any claim against them in their personal capacities. Section 17–7101(b) provides that:

> [n]o suit shall be brought against any officer, director, or stockholder for any debt of a corporation of which he is an officer, director or stockholder, until judgment be obtained therefor against the corporation and execution thereon returned unsatisfied.

Plaintiffs argue that Section 17–7101(b) precludes any effort to pierce the corporate veil, citing *Kilpatrick Bros., Inc. v. Poynter*, 205 Kan. 787, 795, 473 P.2d 33, 40 (1970), and *Meehan v. Adams Enterprises, Inc.*, 211 Kan. 353, 356, 507 P.2d 849 (1973).

While these cases may imply such a requirement, neither case expressly holds that an unsatisfied judgment against the corporation is a prerequisite to an attempt to pierce the corporate veil, and Kansas courts in fact impose no such requirement. *See Doughty v. CSX Transp., Inc.*, 258 Kan. 493, 905 P.2d 106 (1995); *Sampson v. Hunt*, 233 Kan. 572, 665 P.2d 743 (1983); *Amoco Chemicals Corp. v. Bach*, 222 Kan. 589, 567 P.2d 1337 (1977); *Kvassay v. Murray*, 15 Kan.App.2d 426, 808 P.2d 896 (1991); *see also Schmitt v. Beverly Health and Rehabilitation Services, Inc.*, 993 F.Supp. 1354, 1360 (D.Kan.1998). An attempt to pierce the corporate veil or show that the corporation is plaintiffs' alter ego "is different from and not encompassed by the statutory procedure." *US Telecom., Inc. v. 535 Live, Inc.*, 1992 WL 151922 (D.Kan.1992).

The Court therefore concludes that Section 17–7101 does not bar Khosrowshahi's effort to proceed against the Jains in their personal capacities in this case. Plaintiffs are not entitled to judgment on the pleadings on this theory.

## B. Motion for Summary Judgment on Plaintiffs' Statute of Limitations Defense

As noted above, Khosrowshahi alleged that plaintiffs breached various oral agreements to make him a ten percent shareholder in BioCore and BMT, pay him $120,000.00 plus benefits in 1993, and raise his salary to $150,000.00 in 1996. Plaintiffs argue that lex fori requires the Court to apply the law of the forum and that under K.S.A. § 60–512(1), which provides a three-year statute of limitations for actions on unwritten contracts, Khosrowshahi's oral contract claims are barred.

Plaintiffs' position is not well taken. The United States District Court for the Southern District of New York transferred plaintiffs' action to this district under 28 U.S.C. § 1404(a). When a district court does so, the transferring state is generally considered the forum state and its statute of limitations will continue to apply. *See Yoder v. Honeywell, Inc.*, 104 F.3d 1215, 1219 (10th Cir.1997); *Benne v. International Business Machines Corp.*, 87 F.3d 419, 424 (10th Cir.1996); *Schreiber v. Allis–Chalmers Corp.*, 611 F.2d 790, 794 (10th Cir.1979).

Plaintiffs alternatively argue an exception to the general rule, insisting that even if the case was transferred here under Section 1404(a), the law of the transferring court does not apply if it lacked personal jurisdiction over defendants. *Trierweiler v. Croxton and Trench Holding Corp.*, 90 F.3d 1523, 1532 (10th Cir.1996). Plaintiffs do not deny that BioCore and BMT have been doing business in New York and that New York could have exercised personal jurisdiction over the corporations—who are the putative parties to the contracts at issue. Plaintiffs argue, however, that New

York lacked personal jurisdiction over Jain and Ritu Jain,[18] and that Kansas law—rather than New York law—should supply the relevant statute of limitations as to them.[19]

Jain and Ritu Jain bear the burden of establishing lack of personal jurisdiction in this case.[20] New York provides two statutes that provide arguable bases for the exercise of personal jurisdiction over the Jains: CPLR §§ 301 and 302.

### 1. Section 301

■ "Jurisdiction based on the fact that a foreign corporation is doing business in New York is historically founded on the traditional common law concept that the state has power to exercise jurisdiction over those who are within its borders regardless of whether they have expressly consented to be subjected to such jurisdiction." *Lancaster v. Colonial Motor Freight Line, Inc.,* 177 A.D.2d 152, 155, 581 N.Y.S.2d 283, 285 (N.Y.A.D.1992). New York codified this common law concept in CPLR § 301, which provides that: "[a] court may exercise such jurisdiction over persons, property, or status as might have been exercised heretofore." N.Y.S. CPLR § 301. Under Section 301, New York could assert personal jurisdiction against the Jains—even if it was unrelated to their contacts with the state—if they had a presence in the state. Such a presence might arise if the Jains were doing business within the state. *Alexander & Alexander, Inc. v. Donald F. Muldoon & Co.,* 685 F.Supp. 346, 352 (S.D.N.Y.1988). A party is "doing business" under Section 301 when he or she is engaged in such a continuous and systematic course of conduct that the party is "present" in New York. *Laufer v. Ostrow,* 55 N.Y.2d 305, 310, 434 N.E.2d 692, 694, 449 N.Y.S.2d 456, 458 (1982)(*citing McGowan v. Smith,* 52 N.Y.2d 268, 437 N.Y.S.2d 643, 419 N.E.2d 321 (Court.App.1981)). Occasional visits to New York do not constitute "doing business" under Section 301. *Laufer,* 55 N.Y.2d at 310, 434 N.E.2d at 694, 449 N.Y.S.2d at 458. The test is whether the sum of the party's activities in New York is "such that it may be said to be 'present' in the State 'not occasionally or casually, but with a fair measure of permanence and continuity.'" *Id.*

■ Khosrowshahi alleges that Jain traveled to New York to conduct business and that Jain met with him and his wife on these visits. Since 1993 or 1994, Jain has taken approximately two trips to New York per year. Ritu Jain was an active participant in the business of BioCore and BMT and she went to New York to conduct business on their behalf. Khosrowshahi does not present sufficient facts, however, for the Court to find that either of the Jains was "doing business" within New York. He provides no indication regarding

---

**18.** Plaintiffs make the same arguments as to BioVet and BioFoods, but defendants do not bring claims against them. *See Memorandum In Opposition To Plaintiffs' Motion For Summary Judgment On Choice Of Law And Statute Of Limitations* (Doc. # 413) at 11 n.5. As to this point, plaintiffs' motion is moot.

**19.** New York has a six-year statute of limitations for all contracts. N.Y.S. CPLR § 213(2). If plaintiffs were correct in their analysis, and New York lacked personal jurisdiction over Jain and Ritu Jain, Kansas law would apply to the contract claims against those two defendants. New York law would govern the contract claims against the remaining defendants. Consequently the contract claims would be barred as to Jain and Ritu Jain but proceed as to BioCore and BMT. *See Trierweiler v. Croxton and Trench*

*Holding Corp.,* 90 F.3d 1523, 1532 (10th Cir. 1996).

**20.** The Jains seek summary judgment on an affirmative defense for which they would generally bear the burden of proof. *See Avery v. Northern Telecom. Inc.,* 72 F.3d 137 (10th Cir.1995)(Table, text available on Westlaw at 1995 WL 749691). We find no case law which defines the proper standard for analyzing the personal jurisdiction issue in the context in which it arises in this case. The parties do not address the issue. The Court therefore views the issue as one on which the Jains have the burden of proof and does not apply the analytical framework that would pertain to a motion to dismiss for lack of personal jurisdiction. The issue is ultimately irrelevant, however, because the result is the same.

the extent of business that they performed within New York, but merely alleges that both went to New York to conduct business. Without more, the Jains cannot be said to have had a sufficient presence in New York for purposes of Section 301.[21]

### 2. Section § 302(a)(1)

Section 302(a)(1) allows long-arm jurisdiction over an individual that "transacts any business within the state or contracts anywhere to supply goods or services in the state." It provides as follows:

> As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent ... transacts any business within the state or contracts anywhere to supply goods or services in the state.

CPLR § 302(a)(1). Jurisdiction under Section 302(a)(1) requires a substantial relationship between the cause of action and the act providing the basis for jurisdiction. *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467, 522 N.E.2d 40, 43, 527 N.Y.S.2d 195, 198–99 (1988). Even a single transaction within the state may be the basis for jurisdiction so long as it is purposeful. *Id.*

■ "A dispute arising out of the employment relationship is connected to the employment contract that gives rise to the relationship. If this court has jurisdiction over the contract it has jurisdiction over the lawsuit." *Crouch v. Atlas Van Lines, Inc.*, 834 F.Supp. 596, 602 (N.D.N.Y.1993) (quoting *Berk v. Theatre Arts of W.Va., Inc.*, 157 Misc.2d 696, 598 N.Y.S.2d 418, 423 (N.Y. City Civ. Court 1993)). When the parties make a contract in New York and a cause of action arises out of such contract, the consummation of the contract in New York constitutes the transaction of business or minimum contacts necessary to invoke personal jurisdiction. *New Generation Foods, Inc. v. Spicer's Int'l Common Trust*, 669 F.Supp. 599, 600 (S.D.N.Y. 1987); *see also Galgay v. Bulletin Co. Inc.*, 504 F.2d 1062, 1065 (2d Cir.1974); *George Reiner & Co., Inc. v. Schwartz*, 41 N.Y.2d 648, 653, 363 N.E.2d 551, 554, 394 N.Y.S.2d 844, 848 (N.Y.1977).

■ Jain contracted with Khosrowshahi in New York and those negotiations formed the basis for Khosrowshahi's employment with plaintiffs. In a contract-breach case, even if the alleged breach takes place in another state, New York courts will generally find a substantial relationship if the contract itself either was negotiated in New York or contemplated significant performance activities by defendant in New York. *Kelly v. MD Buyline, Inc.*, 2 F.Supp.2d 420, 430 (S.D.N.Y.1998). Because the contract was negotiated in New York, the Court finds that Jain was subject to New York's long-arm jurisdiction.

■ The Court is also satisfied that applying the long-arm statute to Jain does not violate due process. Jain's solicitation of services in New York constituted a purposeful availment of the privilege of conducting activities within the forum State, thus invoking the benefits and the protections of its laws, *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)), such that Jain "should reasonably anticipate being haled into [a New York] court." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). Jain went to New York to hire employees for his corporations. The evidence indicates that he purposefully availed himself of the benefits of New York by hiring and employing Khosrowshahi in New York. Khosrowshahi conducted

21. The Court recognizes that BioCore and BMT have been doing business within New York for purposes of § 301, but New York has never considered a corporation to be an agent of individuals to qualify for personal jurisdiction under § 301. *See Karabu Corp. v. Gitner*, 1998 WL 458098 at *5 n. 4 (S.D.N.Y.1998).

a vast amount of business in New York, thus implicating New York's legitimate interest in regulating the employment relations of its citizens and providing redress for their injuries. *Schenk v. Red Sage, Inc.*, 1994 WL 18630 (S.D.N.Y.1994). The Court finds that New York's exercise of jurisdiction over Jain would not offend "our traditional conception of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 320, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Accordingly, the Court holds that Jain was properly subject to suit in New York.

█ The Court does not reach the same result with respect to Ritu Jain. "The [party's] New York activities must be substantially proximate to the allegedly unlawful acts before the cause of action can be said to arise out of those activities. This determination is necessarily one of degree, informed by considerations of public policy and fundamental fairness." *Hedlund v. Products From Sweden, Inc.*, 698 F.Supp. 1087, 1092 (S.D.N.Y.1988). There must be an "articulable nexus" between the business transacted and the cause of action. *McGowan v. Smith*, 52 N.Y.2d 268, 272, 419 N.E.2d 321, 323, 437 N.Y.S.2d 643, 645 (1981). While defendants assert that Ritu Jain traveled to New York to conduct business, they do not indicate how her contacts relate in any way to their claims. The Court therefore finds that New York could not have exercised personal jurisdiction over Ritu Jain under Section 302(a)(1).

█ New York could exercise personal jurisdiction over Ritu Jain, however, if Bio-Core or BMT was acting as her agent when they negotiated Khosrowshahi's employment contracts in New York. New York applies Section 302 when a corporation engages in a transaction in New York for the benefit of a corporate officer who has knowledge of the transaction and exercises some control over the corporation in the matter. In such a case, the corporation acts as the officer's agent, and the officer is subject to personal jurisdiction. *See Retail Software Services, Inc. v. Lashlee*, 854 F.2d 18, 22 (2d Cir.1988). To show

"control," however, requires proof that the corporate officer was a "primary actor" in the matter in question; control cannot be shown based merely upon title or position within the corporation, or upon conclusory allegations of control. *Karabu Corp. v. Gitner*, 16 F.Supp.2d 319, 324 (S.D.N.Y. 1998). At the heart of this inquiry is whether Ritu Jain was the "primary actor in the transaction in New York" that gave rise to the litigation, and not merely "some corporate employee ... who played no part" in it. *Retail Software*, 854 F.2d at 22. Here, Khosrowshahi does not allege that Ritu Jain knew of or exercised any control over his oral contract claims. On this record, the Court must conclude that New York would not have exercised personal jurisdiction over Ritu Jain based on a theory of corporate agency.

█ New York could also assert personal jurisdiction over Ritu Jain if Bio-Core and BMT, whose presence in New York is beyond dispute, were merely alter egos of Ritu Jain. *See Wm. Passalacqua Builders, Inc. v. Resnick Developers South. Inc.*, 933 F.2d 131, 139 (2d Cir. 1991). In determining whether to assert jurisdiction on an alter ego theory, New York applies the law of the state of incorporation. *Soto v. Bey Transp. Co.*, 1997 WL 407247 at *1 (S.D.N.Y.1997). In Kansas, the doctrine of alter ego applies when an individual uses a corporate entity merely as an instrumentality to conduct her own business, resulting in fraud or injustice on third parties who deal with the corporation. Under the doctrine the courts will disregard the corporate entity and hold an individual responsible for those acts done knowingly and intentionally in the name of the corporation. *Sampson v. Hunt*, 233 Kan. 572, 579, 665 P.2d 743, 751 (Kan.1983). Some of the factors considered significant in justifying a disregard of the corporate entity are (1) undercapitalization of a one-man corporation, (2) failure to observe corporate formalities, (3) nonpayment of dividends, (4) siphoning of corporate funds by the dominant stock-

holder, (5) nonfunctioning of other officers or directors, (6) absence of corporate records, (7) use of the corporation as a facade for operations of the dominant stockholder or stockholders, and (8) use of the corporate entity in promoting injustice or fraud. *Amoco Chemicals Corp. v. Bach,* 222 Kan. 589, 594, 567 P.2d 1337, 1341 (1977). Mere single ownership of a corporation is not sufficient in itself to treat the corporation as an alter ego of the owner and justify a disregard of the corporate veil. *Id.* Finally, courts must exercise reluctantly and cautiously their power to pierce the corporate veil. *Id.* at 593, 567 P.2d at 1341. "The ultimate test for imposing alter ego status is whether, from all of the facts and circumstances, it is apparent that the relationship between the parent and subsidiary is so intimate, the parent's control over the subsidiary is so dominating, and the business and assets of the two are so mingled that recognition of the subsidiary as a distinct entity would result in an injustice to third parties. In addition to the factors used to determine a corporate alter ego status, a plaintiff must show that allowing the legal fiction of a separate corporate structure would result in injustice toward the plaintiff." *Doughty v. CSX Transp., Inc.,* 258 Kan. 493, 500, 905 P.2d 106, 111 (1995).

■ The record contains no evidence that BioCore or BMT are undercapitalized or fail to observe corporate formalities, pay dividends, or keep corporate records, or that directors and officers are non-functioning. It does suggest, however, that Ritu Jain has been an active participant in the corporations and that she siphoned corporate funds for her own use and that of her extended family, to the detriment of third parties such as Khosrowshahi.[22]

Khosrowshahi has raised a genuine issue of material fact regarding whether New York would find Ritu Jain to be the alter ego of BioCore and BMT. As such, he has identified a genuine issue of material fact whether New York could exercise personal jurisdiction over Ritu Jain.[23] As a result, plaintiffs are not entitled to summary judgment on their affirmative defense that the Kansas statute of limitations operates as a bar to any claims on unwritten contracts.[24]

**C. Motion for Summary Judgment on Breach of Contract Claims Regarding Untransferred Stock**

As noted above, Khosrowshahi claims that plaintiffs breached Jain's agreements to make him a ten percent stockholder in BioCore and BMT. Plaintiffs argue that they are entitled to summary judgment on these claims because (1) Khosrowshahi's allegations regarding the 1993 contract to give him stock in BioCore are not credible because they differ from his affidavit; (2) Khosrowshahi's allegations regarding the 1995 contract are not credible because K.S.A. § 17–6402 prevented Khosrowshahi from receiving BMT stock in exchange for future services and K.S.A. § 17–6411 required the BMT board of directors to approve any stock issuance; and (3) both of Khosrowshahi's stock claims are incredible because the alleged contracts are not evidenced by corporate records.

As previously noted, Khosrowshahi alleges that in 1993, Jain agreed to make him a ten percent shareholder in BioCore. Plaintiffs claim that they are entitled to summary judgment on this claim because Khosrowshahi's affidavit contradicts his complaint: the affidavit states that Khos-

---

22. Plaintiffs argue that any payments by BioCore were pursuant to corporate policy, but if the corporations were merely fronts for the Jains, the Jains could make whatever "corporate policy" they wished.

23. The Court also notes that under the same theory, New York could also exercise personal jurisdiction over Jain.

24. The Court stresses that it has not made a binding determination that New York law applies. Instead, the Court finds that genuine issues of material fact prevent it from summarily deciding the issue.

rowshahi and Jain agreed that he would become a ten percent shareholder in November of 1993, while the complaint alleges that the parties agreed that he would become a shareholder in *September* of 1993 and further agreed in *November* of 1993 that he would have a ten percent interest. While the statements are somewhat different, they are not so inherently incredible or self-contradictory that a reasonable jury would necessarily find against Khosrowshahi on these claims. A reasonable jury could find that Jain and Khosrowshahi generally agreed in September of 1993 that he would become a shareholder, and that in November of 1993 they determined the specific percentage of stock he would receive.

■ Khosrowshahi also alleges that in 1995, Jain agreed that Khosrowshahi would become a ten percent shareholder in BMT if he became its president. Plaintiffs argue that they are entitled to summary judgment on this claim because BMT was not incorporated until 1996 and K.S.A. § 17–6402 prevented BMT from issuing stock for Khosrowshahi's future services as BMT president. Section 17–6402 provides that a corporation can issue stock when "[t]he entire amount of such consideration has been received by the corporation in the form of cash, services rendered, personal property, real property, leases of real property, or a combination thereof." K.S.A. § 17–6402. Services which have not been rendered are not sufficient consideration for the issuance of stock. *Burge v. Frey*, 545 F.Supp. 1160, 1171 (D.Kan.1982). According to plaintiffs, the statute proves that Jain did not make the alleged contract. The Court disagrees. The statute only addresses the question of whether the corporation received sufficient consideration for any agreement to issue the stock; it says nothing about whether Jain made the agreement in question.[25] Also, the statute does not prohibit a stockholder (such as BioCore) from transferring

stock to a third party. Khosrowshahi does not allege that Jain promised that BMT would issue new stock to him. Depending on the evidence, a reasonable jury could infer that Jain promised that BioCore would give Khosrowshahi existing stock in BMT.

■ Plaintiffs next assert that Jain lacked the power to convey stock in BMT because BioCore is the sole owner of BMT stock and K.S.A. § 17–6411 required BMT's board of directors to approve any stock issuance to Khosrowshahi. Section 17–6411(a) provides that "[e]very corporation may purchase, receive, take or otherwise acquire, own and hold, sell, lend, exchange, transfer or otherwise dispose of, pledge, use and otherwise deal in and with its own shares …" K.S.A. § 17–6411. This statute, however, does not speak to the question whether the BMT board had to approve a stock transfer to Khosrowshahi. Moreover, Jain is the principal shareholder in BioCore, which in turn owns BMT, and the CEO of BMT. On this record, a jury might reasonably find that he had actual or apparent authority to obligate BioCore and/or BMT to convey stock to Khosrowshahi. In addition, the record does not suggest that the BMT board had to approve the transfer of existing shares, and a reasonable jury might find that Jain promised to transfer ten percent of BMT's stock from BioCore to Khosrowshahi.

Plaintiffs also claim that they are entitled to summary judgment because corporate records do not substantiate the claimed financial obligations to Khosrowshahi. The lack of corporate records does not help Khosrowshahi, but by the same token it does not defeat his claims. Khosrowshahi alleges that he did not receive his full salary and he cites evidence to support his claim.[26] Genuine issues of material fact preclude summary judgment on these claims.

---

25. Significantly, plaintiffs do not claim that under the statute, any agreement would be unenforceable for lack of consideration.

26. While plaintiffs attack Khosrowshahi's affidavit as self-serving, the Court finds it no less so than plaintiffs' own affidavits.

## D. Motion for Summary Judgment on Certain Breach of Employment Contract Claims

Khosrowshahi claims that plaintiffs terminated his employment in violation of employment contracts which required warning and notice prior to termination. Plaintiffs argue that Khosrowshahi has abandoned these claims. *See Pretrial Order* (Doc. # 421). Khosrowshahi concedes that he no longer claims breach of an *implied* employment contract to provide warning and notice. While he does not concede that he has abandoned any express contract claims to that effect, no such claims are found in the *Pretrial Order* (Doc. # 421). The pretrial order supersedes all pleadings and controls the subsequent course of the case. *See Hullman v. Board of Trustees of Pratt Community College,* 950 F.2d 665, 667 (10th Cir.1991). Plaintiffs are entitled to summary judgment on these claims.

## E. Motion for Summary Judgment on Claims for Unjust Enrichment and Statutory Wage Claims

As noted above, Khosrowshahi claims that plaintiffs have been unjustly enriched and have violated Kansas and New York wage statutes by failing to pay unpaid wages, benefits and stock shares. Plaintiffs seek summary judgment on such claims, alleging that Khosrowshahi has received what he is owed. Khosrowshahi responds that plaintiffs have been unjustly enriched by failing to pay amounts due under the contracts. Genuine issues of material fact prevent the Court from determining these issues as a matter of law.

## II. Summary Judgment Motion by Khosrowshahi

As noted above, plaintiffs claim that Khosrowshahi entered into nine unautho-

rized contracts. Plaintiffs' entire claim regarding the nine contracts consists of the following two sentences:

> During his employment with BioCore, Khosrowshahi entered into various contracts with third parties without proper authority and in violation of BioCore's express instructions. The contracts include those with BioCompressions, Plasystems, International Features, Jack Pivar, Health Management Publications, Southard Communications, Dana Moore, Farnam and Arastoo, Inc.

*Pretrial Order* (Doc. # 421) at 4–5.

Khosrowshahi claims that he is entitled to summary judgment on the unauthorized contract claims because as a matter of law (1) he had authority to enter into the questioned contracts and (2) in any event, plaintiffs ratified his actions and they have waived or are estopped from asserting any claim that he lacked authority. See *Defendants' Motions For Summary Judgment On Plaintiffs' Unauthorized Contract Claims* (Doc. # 444) filed November 16, 1998. Plaintiffs argue that Khosrowshahi only had limited authority to enter into contracts and that the foregoing nine contracts exceeded that authority.[27]

The law regarding ratification holds that upon acquiring knowledge of an agent's unauthorized act, a principal should promptly repudiate the act; otherwise it will be presumed that he has ratified and affirmed the act. *Schraft v. Leis,* 236 Kan. 28, 37, 686 P.2d 865, 873 (1984). Knowledge of the unauthorized act is essential for the principal to ratify the act, however, and Khosrowshahi must show either knowledge or facts that create a necessary inference of knowledge. *Brown v. Wichita State University,* 217 Kan. 279, 287, 540 P.2d 66, 75 (1975). A principal's

---

**27.** Plaintiffs respond that Khosrowshahi cannot argue ratification, waiver or estoppel because he failed to plead them as affirmative defenses. *See* Fed.R.Civ.P. 8(c). Khosrowshahi did, however, include such defenses in the pretrial order. See Doc. # 421 at 4, ¶ 4, which supersedes all pleadings and controls the subsequent course of the case. *See Hullman v. Board of Trustees of Pratt Community College,* 950 F.2d 665, 667 (10th Cir.1991); *Zapata v. IBP. Inc.,* 1998 WL 717621 (D.Kan. 1998). Therefore Khosrowshahi can assert these defenses in his motion.

election to ratify an unauthorized act requires ratification of the whole act, as a principal may not accept the benefits of the act and reject its burdens. *Schraft,* 236 Kan. at 36, 686 P.2d at 873; *Adrian v. Elmer,* 178 Kan. 242, 246, 284 P.2d 599, 603 (1955).

■ Khosrowshahi also argues that plaintiffs waived any limits on his authority. Waiver implies that a party has voluntarily and intentionally renounced or given up a known right, or has caused or done some positive act or positive inaction which is inconsistent with the contractual right. Waiver is consensual in nature but the intention may be inferred from conduct and the knowledge may be actual or constructive. *Schraft,* 236 Kan. at 36, 686 P.2d at 873.

■ Khosrowshahi finally argues that estoppel should bar plaintiffs due to their failure to earlier raise the issue, soon after learning of the allegedly unauthorized contracts. Estoppel involves an assertion of rights inconsistent with past conduct, silence by those who ought to speak, or situations where it would be unconscionable to permit persons to maintain a position inconsistent with one in which they have already acquiesced. *Schraft,* 236 Kan. at 36, 686 P.2d at 873.

The record on Khosrowshahi's motion is, to speak bluntly, a mess. As a preliminary matter, before we consider whether the contracts were unauthorized, one might inquire whether plaintiffs have produced evidence that Khosrowshahi even entered into any contracts in the first place. Plaintiffs cite no evidence on this topic, but merely list the third parties with whom Khosrowshahi allegedly contracted without authority. Plaintiffs provide no details regarding any of the contracts, and Khosrowshahi denies that he entered into any agreements whatsoever with Plasystems or Farnam. Plaintiffs cite no evidence that Khosrowshahi entered into any agreement with Farnam, and he is therefore entitled to summary judgment on this claim. As to Plasystems, plaintiffs allege that "Khosrowshahi made the financial commitment that resulted in BioCore purchasing the product from Plasystems." What this means is anyone's guess.[28] Given Khosrowshahi's specific denial that he entered into any agreements with Plasystems, plaintiffs' vague and conclusory allegation (even though supported by Jain's affidavit) does not raise a genuine issue of material fact whether Khosrowshahi entered into the Plasystems contract. Khosrowshahi is entitled to summary judgment on both of these claims.

Luckily for plaintiffs, Khosrowshahi has admitted numerous transactions with many of the third parties whom plaintiffs have named. Because plaintiffs' claims are so vague and imprecise, however, the Court has no idea whether the transactions that Khosrowshahi has admitted are even the transactions that plaintiffs claim are unauthorized. In order to defeat plaintiffs' imprecise claims, Khosrowshahi has been forced to generally establish that he did not enter into *any* unauthorized contracts. Plaintiffs have the burden of proving otherwise, as to the seven remaining contracts. Because plaintiffs have cited no evidence to the contrary, the Court finds that the contracts which Khosrowshahi has admitted are the only contracts that he entered into with these third parties.

The summary judgment process is further confounded by plaintiffs' failure to explain in what respect any of the agreements exceeded Khosrowshahi's authority. The only cited limits on his authority are the BMT resolution and Jain's personal requirement that Khosrowshahi not finalize contracts or otherwise obligate BioCore or its subsidiaries. The BMT resolution does not purport to limit Khosrowshahi's authority as to BioCore, however, and it does not apply to BioCore contracts. The issue is further confused because in some

**28.** Plaintiffs provide no facts regarding Khosrowshahi's actions and involvement in the Plasystems agreement, nor do they explain what "financial commitment" resulted in BioCore's purchase from Plasystems or how Khosrowoshahi figures into the transaction.

situations plaintiffs executed renewal contracts which superseded contracts that Khosrowshahi may have entered into without authority. Plaintiffs make no effort to differentiate particular transactions between the same parties, or to explain why a renewal or performance of an unauthorized contract would not constitute waiver, estoppel or ratification. Therefore, subject to the caveat that the Court is necessarily forced to speculate how any given contract may have exceeded Khosrowshahi's authority, the Court will address in turn each of the allegedly unauthorized contracts.

### 1. Contract between BioCore and Dana Moore

■ As noted above, in 1994, Khosrowshahi negotiated a contract between BioCore and Dana Moore, an independent non-salaried representative for the New England sales territory. The contract is between BioCore and Moore, and BMT's corporate resolution did not limit Khosrowshahi's authority to enter into it. Khosrowshahi's authority was only limited, if at all, by Jain. On April 6, 1996, Byron Frye, plaintiffs' director of new territory development, renewed Moore's contract. This renewal contract contained a clause detailing that BioCore was exercising certain buy-out rights by paying Moore four installments of $515.00 to acquire all of his rights except those in Massachusetts.

BioCore paid the first buy-out payment on April 19, 1996, and made further payments on July 19, 1996, November 12, 1996, and January 17, 1997. In April of 1997, BioCore terminated its remaining agreement with Moore.

Plaintiffs assert that Khosrowshahi exceeded his authority by including a buy-out provision in Moore's contract. The evidence shows, however, that Frye signed the renewal contract and that the renewal

contract detailed the buy-out provision which obligated BioCore during the relevant periods. The renewal contract superseded all prior agreements. BioCore does not claim that Frye lacked authority to enter into the renewal agreement, and the record does not suggest that BioCore lacked full knowledge of the buy-out provision when Frye executed it. The Court finds as a matter of law that by renewing the Moore contract, BioCore waived any claim regarding the buy-out provision and ratified any allegedly unauthorized conduct by Khosrowshahi. *See Schraft*, 236 Kan. at 36, 686 P.2d at 873.

### 2. Contract between BioCore and Health Management Publications

■ As noted above, beginning in April of 1994, BioCore participated in conventions and seminars organized by Health Management and advertised in its trade journals. Jain knew that BioCore participated in the seminars. In 1997, he helped design BioCore's exhibits and decide which seminars BioCore would attend. Jain did not know what financial commitments Khosrowshahi made to Health Management on November 7, 1996, when he told Health Management that BioCore intended to participate in six regional seminars in 1997.

As noted above, plaintiffs have only identified two limits on Khosrowshahi's ability to contract: (1) Jain's complete prohibition against finalizing contracts or obligating BioCore or its subsidiaries, and (2) BMT's corporate resolution. Neither limitation applies to the Health Management agreement.[29] Plaintiffs claim that Khosrowshahi exceeded his authority in contracting with Health Management in that, while they were aware of the services they received from Health Management and enjoyed the benefits of their agreement with

---

**29.** From the record it appears that plaintiffs' only gripe concerns commitments Khosrowshahi made in 1997. In 1997, however, Jain participated in the decision as to which seminars BioCore would attend. The record contains no evidence that Khosrowshahi lacked authority to commit BioCore to participate in six regional seminars in 1997. Also, it contains no evidence that Khosrowshahi lacked authority to commit BioCore to a given course of advertising.

Health Management, Jain was not aware of the financial commitment that Khosrowshahi had made on behalf of BioCore. The record contains no evidence, however, that Khosrowshahi's authority depended on the depth of Jain's knowledge about the details of a particular transaction. Therefore, while Khosrowshahi may have exceeded his authority with respect to some limitation not contained in the record, plaintiffs have not established a genuine issue of material fact whether Khosrowshahi lacked authority to contract with Health Management.

### 3. Contract between BioCore and International Features

As noted above, since even before 1996, BioCore advertised in *BioMechanics*, a magazine published by International Features. Beginning in 1996, BioCore also developed a wound care section for the magazine, published would care articles in that section, and controlled all other articles in the section. In exchange, Khosrowshahi apparently made financial commitments to International Features. Plaintiffs have not supplied details regarding commitments or agreements with International Features, however, and they cite no evidence that Khosrowshahi made any agreement or obligation on behalf of BMT.[30] Plaintiffs have failed to meet their burden of showing that this agreement violated BMT's limit on Khosrowshahi's authority.

The Court must determine whether plaintiffs can assert Jain's complete limit on Khosrowshahi's authority. Before making any financial commitments to International Features, Khosrowshahi discussed the plan with Jain. Jain approved the agreement but was unaware of the financial commitment that Khosrowshahi had made to the magazine. Jain helped edit some of the articles that BioCore submitted for publication. In 1997, Khosrowshahi renewed BioCore's participation

with *BioMechanics* after again discussing the issue with Jain, who approved it.

Plaintiffs claim that Khosrowshahi exceeded his authority in dealing with *BioMechanics*. The evidence shows, however, that Jain knew about Khosrowshahi's agreement with International Features and waived any requirement that Khosrowshahi not finalize contracts or otherwise obligate BioCore. Jain discussed and approved the agreement with Khosrowshahi before Khosrowshahi entered into it. After Khosrowshahi entered the agreement, Jain helped edit articles for the magazine. At this point, Jain clearly should have known that BioCore had an agreement with *BioMechanics* which was similar to the one that Khosrowshahi had previously discussed with him. Jain obviously knew of the agreement when he and Khosrowshahi discussed the prospect of renewing it. Despite his knowledge that Khosrowshahi had entered an agreement in violation of the putative limitations on his authority, Jain failed to act. While plaintiffs apparently argue that Khosrowshahi violated some financial limit, they do not provide evidence of any limit that prevented this agreement. As noted above, the record contains no evidence that Khosrowshahi's authority depended on the depth of Jain's knowledge about the details of a particular transaction. Therefore, while Khosrowshahi may have exceeded his authority with respect to some limitation not contained in the record, plaintiffs have not established a genuine issue of material fact whether Khosrowshahi lacked authority to contract with International Features.

The evidence also shows that Jain waived any limitation on Khosrowshahi's authority when BioCore entered into the renewal contract. Khosrowshahi discussed the contract renewal with Jain and Jain approved it. Plaintiffs do not dispute this fact, and the Court therefore finds

---

**30.** Khosrowshahi alleges that BioCore was financially obligated, and the evidence shows

numerous checks from BioCore to International Features; none are from BMT.

that Jain authorized the renewal contract with *BioMechanics*.

### 4. Contract between BioCore and Arastoo

As noted above, in 1992, Jain asked Khosrowshahi to contact Arastoo to see whether BioCore products had a market in the Middle East. In 1994, Khosrowshahi entered into an agreement with Arastoo to conduct a market research study. On December 29, 1994, Jain signed a $50,000.00 check in full payment for Arastoo services. Jain denies that he knowingly did so, claiming that he occasionally signed blank checks.

■ Plaintiffs fail to provide any details regarding agreements and financial obligations with Arastoo, but they do not suggest that the commitments had anything to do with BMT.[31] Consequently the BMT resolution did not limit Khosrowshahi's authority. Moreover, plaintiffs cannot claim lack of authority based on Jain's requirement that Khosrowshahi not finalize contracts or otherwise obligate Bio-Core. Jain was at least generally aware of the agreement that Khosrowshahi had made with Arastoo, and his knowledge was imputable to BioCore. *See City of Arkansas City v. Anderson*, 243 Kan. 627, 635, 762 P.2d 183, 189 (1988).

Khosrowshahi asserts that because Jain signed the $50,000.00 check to Arastoo, plaintiffs waived any limit or are otherwise estopped from relying on any limit. Plaintiffs disagree, alleging that Jain did not know that he was signing a check for Arastoo. While Jain disputes how much he knew about the Arastoo contract, plaintiffs were aware of both the limitations on Khosrowshahi's authority and the $50,-000.00 payment to Arastoo. If the Arastoo contract was unauthorized, plaintiffs' knowledge placed them on notice of the fact that Khosrowshahi had exceeded his authority. Yet plaintiffs failed to speak between December 29, 1994, when Jain

signed the $50,000.00 check, and 1998, when they first claimed in this lawsuit that Khosrowshahi had exceeded his authority. The Court finds as a matter of law plaintiffs waived any claim of any lack of authority.

### 5. Contract between BMT and Southard Communications

■ As noted above, in late 1996, pursuant to instructions from Khosrowshahi, BMT entered into a contract to pay $6,500.00 a month to Southard Communications, a public relations firm, for public relations services. Plaintiffs fail to provide any details regarding agreements and financial obligations with Southard Communications, but they cite evidence that Jain did not authorize the contract. Unfortunately, their evidence does not establish that Khosrowshahi failed to get authority from other BMT officials. The corporate resolution required approval by "the Board of Directors, the Chairman of the Board, or the Vice President of Finance." Jain served on the board of directors, and the fact that he did not authorize the contract suggests that the board did not authorize it. Plaintiffs do not cite evidence, however, that Jain was the chairman of the board or the vice president of finance. Khosrowshahi could have received approval from either of these persons (whoever they were) and if so, he did not need approval from Jain to make an authorized contract. Plaintiffs have therefore failed to establish that Khosrowshahi violated BMT's resolution.

The Court must determine whether plaintiffs can rely on Jain's requirement that Khosrowshahi not finalize contracts or otherwise obligate BioCore or its subsidiaries. Clearly, he did not. It is undisputed that Tim Metz, BioCore's general counsel and secretary, executed the contract for BMT. BioCore received services under the contract and pursuant to its terms paid

---

**31.** BMT did not exist in 1994 and for obvious reasons its $500.00 limit was not in place in 1994. Moreover, the record reflects that Bio-

Core was responsible for any financial commitments made by Khosrowshahi to Arastoo.

at least $13,000.00 to Southard Communications. Jain and Khosrowshahi had met with Bill Southard in New York in the spring of 1996, and as part of the contract Southard flew to Kansas to meet with Jain.

Based on the evidence, the Court finds that plaintiffs knew of and approved the allegedly unauthorized contract before and after BMT signed it. Plaintiffs knew about the alleged limits on Khosrowshahi's authority, yet Metz executed the agreement which Khosrowshahi had negotiated on behalf of BMT. From all that appears in the record, Metz was authorized to commit BMT to this agreement; plaintiffs certainly cite no evidence to the contrary. Plaintiffs then paid Southard Communications according to the terms of the contract. The record evidence firmly establishes that plaintiffs knew that Khosrowshahi had negotiated a contract with Southard Communication and that Metz had executed it on BMT's behalf. *See City of Arkansas City v. Anderson,* 243 Kan. 627, 635, 762 P.2d 183, 189 (1988). Plaintiffs voluntarily and intentionally renounced or gave up any right to claim that the contract was unauthorized. If BMT wished to repudiate the contract on the ground that it was unauthorized, plaintiffs were obliged to repudiate it promptly upon acquiring knowledge of Khosrowshahi's unauthorized act. They did precisely the opposite, and the Court does not hesitate in concluding as a matter of law that they ratified and affirmed his conduct.

### 6. *Contract between BMT and Jack Pivar*

■ As noted above, on May 15, 1996, pursuant to instructions from Jain, Khosrowshahi executed a consulting agreement between plaintiffs and Jack Pivar, a Medicare reimbursement consultant. Plaintiffs fail to provide any details regarding agreements and financial obligations with Pivar, but they do not deny that Jain authorized Khosrowshahi to execute a consulting agreement with Pivar. Instead they dispute that Jain was aware of the degree of the financial commitment involved.

Plaintiffs have again failed to show that Khosrowshahi did not get authority from other BMT officials—aside from Jain—or that they did not have full knowledge regarding the scope of the financial commitment which the contract entailed. Khosrowshahi could have received approval from either the chairman of the board or the vice president of finance; he did not need Jain's approval to make an authorized contract. Plaintiffs therefore have failed to meet their burden of establishing that Khosrowshahi violated the BMT resolution.

Metz and Jain were both aware of the agreement before Khosrowshahi executed it. Plaintiffs also knew that Khosrowshahi had entered the agreement because it is undisputed that Pivar provided consulting services. Plaintiffs did not terminate Pivar's agreement until January of 1997. Plaintiffs therefore knew that Khosrowshahi had entered the contract and the Court therefore finds that plaintiffs waived Jain's requirement that Khosrowshahi not finalize contracts or otherwise obligate BioCore or its subsidiaries. Again, as noted above, the issue is not whether Jain had full knowledge of all details of the contractual relationship or the degree of the financial commitment which it contemplated. Khosrowshahi's authority did not depend on the degree to which Jain elected to become informed or remain ignorant of plaintiffs' business.

### 7. *Contract between BMT and BioCompressions*

■ Plaintiffs fail to provide any evidence regarding the contract between BMT and BioCompressions, but as noted above, in the fall and winter of 1996, Khosrowshahi and Jain had numerous discussions about entering into a distribution agreement with BioCompressions. Jain told Khosrowshahi to move as expeditiously as possible to bring BioCompressions on board, and said that he wanted BioCompressions to begin distributing BioCore products by January 1, 1997. Jain partici-

pated in the contract negotiations with BioCompressions. Metz, BioCore's general counsel, drafted the agreement. In February of 1997, Metz sent a copy of the contract to BioCompressions. Jain continuously complained that the contract had not been executed and in March of 1997, Khosrowshahi executed it. Jain alleges that he was unaware of the details of the contract. In June of 1997, however, BioCore and BioCompressions discussed contract disputes and after the meeting, BioCore decided to move forward with the BioCompressions contract.

Again, plaintiffs fail to show that Khosrowshahi violated the BMT resolution. The Court finds that plaintiffs also cannot assert Jain's requirement that Khosrowshahi not finalize contracts or otherwise obligate BioCore or its subsidiaries. BioCore employees, including Jain, were extremely involved in the process of creating the contract. Jain complained to Khosrowshahi that the contract had not been executed. Plaintiffs had knowledge of the contract terms before Khosrowshahi executed it. Most importantly, plaintiffs had a meeting in June of 1997 regarding problems with the BioCompressions agreement. Instead of repudiating Khosrowshahi's authority, they agreed to remain in the contract. At this point, it is clear that plaintiffs had knowledge that Khosrowshahi entered into a contract with BioCompressions. Plaintiffs ratified any unauthorized agreement by plaintiffs.

### III. Remaining Claims

Consistent with the prior rulings and pursuant to Rule 56(d), Fed.R.Civ.P., the Court finds that various issues remain for trial. Plaintiffs' remaining claims are that Khosrowshahi (1) converted personnel files and other records from their offices in Topeka; (2) misappropriated funds by entering into a contract with Arastoo, Inc. which cost plaintiffs $50,000.00, and for which plaintiffs received nothing in return; (3) breached an agreement not to compete with plaintiffs for two years after leaving plaintiffs' employment; (4) breached plaintiffs' trademark rights, along with federal unfair trade practice laws, by using plaintiffs' trademarks; (5) breached fiduciary duties which he owed as a corporate officer of plaintiffs; (6) violated the Kansas Uniform Trade Secrets Law, K.S.A. § 60–3320, by acquiring and misappropriating plaintiffs' trade secret information; (7) engaged in unfair competition in violation of the common law by competing with plaintiffs and misappropriating their trade secrets; and (8) tortiously interfered with plaintiffs' business and potential economic advantage by misappropriating their trade secrets and using their trademarks. The Court grants defendants' motion for summary judgment on plaintiffs' unauthorized contract claims.

Khosrowshahi's remaining claims allege that plaintiffs are liable for (1) breach of agreements to make him a 10% shareholder in BioCore and BMT and pay him $120,000.00 plus benefits in 1993 and raise his salary to $150,000.00 in 1996; (2) unjust enrichment, based on their failure to pay unpaid wages, benefits, and stock shares; and (3) violations of Kansas and New York state wage claims, also based on their failure to pay wages, benefits, and stock shares.

**IT IS THEREFORE ORDERED** that plaintiffs' *Motion For Partial Judgment On The Pleadings On [Defendants'] Accounting Claim And On All Claims Against Manoj And Ritu Jain* (Doc. # 345), filed September 17, 1998 be and hereby is **DENIED.**

**IT IS FURTHER ORDERED** that plaintiffs' *Motion To Reconsider Court's Decision On Choice Of Law* (Doc. # 378), filed October 13, 1998 be and hereby is **DENIED.**

**IT IS FURTHER ORDERED** that plaintiffs' *Motion For Summary Judgment On Choice Of Law And Statute Of Limitations,* (Doc. # 400) filed October 21, 1998 be and hereby is **DENIED.**

**IT IS FURTHER ORDERED** that plaintiffs' *Motion For Summary Judgment* (Doc. # 442) filed November 16, 1998

is **SUSTAINED** as to Khosrowshahi's claims for specific performance and breach of express and implied contracts of employment and is otherwise **DENIED.**

**IT IS FURTHER ORDERED** that defendants' *Motion To Strike The Reply Memorandum In Support Of Plaintiffs' Motion for Judgment On Choice Of Law And Statute Of Limitations* (Doc. # 474) filed December 1, 1998 be and hereby is **DENIED.**[32]

**IT IS FURTHER ORDERED** that defendants' *Memorandum In Support of Defendants' Motions For Summary Judgment On Plaintiffs' Unauthorized Contract Claims* (Doc. # 444) filed November 16, 1998 be and hereby is **SUSTAINED.**

---

**32.** This motion concerned Callaci's claims against plaintiffs, which are no longer in dispute. The Court therefore denies the motion as moot.